OPINION
{¶ 1} This case involves three appeals from Mahoning County Common Pleas Court judgments granting summary judgment on various claims to various parties and can best be described as a divorce among law partners. Plaintiff-appellant/cross-appellee, Robert Tablack, appeals the court's judgment granting summary judgment to defendants-appellees/cross-appellants, John Jeren, Jr., Timothy Hackett, and Nikitas Skoufatos, and to defendant-appellee/cross-appellant, Jeanne Wellman, on Tablack's claims for breach of fiduciary duty, breach of contract, fraud/promissory estoppel, age discrimination, and public policy tort. Jeren, Hackett, and Skoufatos (JHS) appeal the court's judgment granting summary judgment in favor of Tablack on their claims for malicious civil prosecution, abuse of process, frivolous conduct, and declaratory judgment. And Wellman appeals from the court's judgment granting Tablack summary judgment on her claims for malicious prosecution, abuse of process, frivolous conduct, and declaratory judgment.
 {¶ 2} Tablack shared law office space with Wellman Jeren, Co., L.P.A. dating back some time. Tablack had an informal agreement with Thomas Wellman whereby they shared income on a fifty-fifty basis for cases within or growing from their workers' compensation practice. During the time this agreement was in effect, Jeren came to work on a medical malpractice case that stemmed from either Tablack's or Wellman's workers' compensation practice. It resulted in a settlement of $240,000 in 1985. Subsequently, Wellman asked Tablack if they could divide the fee equally among the three of them. Tablack agreed, and received his $80,000 share. Many years later, Tablack allegedly learned that Wellman had received more than his one-third share and that Jeren received less than his one-third share.
 {¶ 3} In 1991, Wellman Jeren, Co. grew to become the law firm of Tablack, Wellman, Jeren, Hackett Skoufatos, Co., L.P.A. (the firm). All parties in this case are attorneys who, at one time, were partners in the firm.[1] The five partners were also the five shareholders in this close corporation. The shares were divided as follows: Tablack owned 30 percent; Wellman owned 30 percent; Jeren owned 20 percent; Hackett owned ten percent; and Skoufatos owned ten percent. From 1991 to 1993, the firm divided its net income amongst its shareholders in proportion to their shares.
 {¶ 4} In January 1993, the shareholders met to discuss their compensation and the potential retirement of the two oldest shareholders: Tablack, who was 64 at the time; and Wellman, who was approximately 59 at the time. After the meeting, the shareholders entered into an agreement (1993 Agreement) setting Tablack's and Wellman's "phasing out" of the firm. Under the terms of the 1993 Agreement, Tablack's compensation was to drop from 30 to 24 percent, when he reached age 65; from 24 to ten percent, when he reached age 70; and compensation would cease when he reached age 73. Additionally, once Tablack turned 73, the firm would purchase his shares of stock for $70,000.
 {¶ 5} Tablack signed the 1993 Agreement, both as a shareholder and as the firm's vice president. However, Tablack asserts the only reason he signed the 1993 Agreement was to avoid being forced to retire at age 65, which he claims Jeren threatened.
 {¶ 6} In January 1998, at Tablack's initiation, the shareholders met again to discuss compensation and retirement. They reached a new agreement (1998 Agreement). The 1998 Agreement provided for benefits to Tablack's and Wellman's spouses in the event of their deaths. It further provided that Tablack's compensation would drop from 30 to 24 percent, when he reached age 65; from 24 to 16 percent, when he reached age 70; from 16 to 13 percent, when he reached age 71; from 13 to ten percent, when he reached age 73; and compensation would cease, when he reached age 75. At age 75, Tablack was then required to surrender his shares of stock.
 {¶ 7} Tablack signed the 1998 Agreement, again both as a shareholder and as the firm's vice president.
 {¶ 8} On October 4, 2001, Tablack filed a claim against JHS and Wellman asserting breach of fiduciary duty, breach of contract, fraud/promissory estoppel, age discrimination, and public policy tort. JHS asserted a counterclaim for a declaratory judgment seeking a declaration that as a result of Tablack's breach of the 1998 Agreement, they were excused from performance, and claims for malicious civil prosecution, abuse of process, and frivolous conduct. Wellman asserted the same counterclaims as JHS.
 {¶ 9} Tablack filed a motion to dismiss, which in essence was a motion for summary judgment because he relied upon facts outside of the record. JHS and then Wellman also filed motions for summary judgment.
 {¶ 10} On January 13, 2003, the trial court denied all motions for summary judgment, finding that genuine issues of material fact existed with regard to all causes of action.
 {¶ 11} On October 14, 2003, when he turned 75, Tablack's employment with the firm terminated. Subsequently, Tablack filed an amended complaint that added an age discrimination claim for his termination and amended his public policy tort claim to include wrongful termination based on age.
 {¶ 12} The case was assigned to a new judge. The new judge permitted JHS and Wellman to file summary judgment motions as to Tablack's new claims and to file motions for reconsideration of the court's previous summary judgment rulings.
 {¶ 13} The court held a hearing on the motions and subsequently entered judgments granting JHS's and Wellman's motions for summary judgment on Tablack's claims and granting Tablack's motion for summary judgment on JHS's and Wellman's claims. All parties then filed timely notices of appeal/cross-appeal.
 {¶ 14} Tablack lists four assignments of error as follows:
 {¶ 15} "IN DECIDING THIS CASE AT SUMMARY JUDGMENT, THE TRIAL COURT IGNORED EVIDENCE PROPERLY SUBMITTED BY PLAINTIFF, IGNORED DISPUTES OF MATERIAL FACTS, AND APPLIED AN INCORRECT BURDEN OF PROOF TO PLAINTIFF ON THE BREACH OF FIDUCIARY DUTY CLAIM."
 {¶ 16} "ABSENT A SUBSTANTIVE CHANGE IN THE LAW, IT IS ERROR FOR A SUCCESSOR JUDGE, WHEN REVIEWING THE SAME FACTS, EVIDENCE AND ISSUES AS THE ORIGINAL JUDGE, TO REACH A DIFFERENT CONCLUSION AT SUMMARY JUDGMENT."
 {¶ 17} "THE COURT ERRED IN DETERMINING WHEN THE STATUE OF LIMITATIONS BEGINS TO RUN ON AN EMPLOYMENT CONTRACT AND TERMINATION WHICH VIOLATE THE LAW PROHIBITING AGE BASED DISCRIMINATION"
 {¶ 18} "IT IS ERROR TO CHARACTERIZE AN EMPLOYMENT AGREEMENT WHICH TERMINATES EMPLOYMENT SOLELY BASED UPON AGE AND PROVIDES NO BENEFITS AS A RETIREMENT PLAN."
 {¶ 19} However, Tablack's brief then goes on to address what appear to be seven assignments of error, some of which fit under the listed assignments of error and some of which do not. Thus, we will address the alleged errors as set out in Tablack's argument section. We will address his first, third, and fourth alleged errors first because they are procedural in nature. We will then address his remaining alleged errors, which go to the merits of the trial court's granting of summary judgment. They will be referred to as issues for review.
 PROCEDURAL ISSUES {¶ 20} Tablack's first issue for review states:
 {¶ 21} "THE TRIAL COURT FAILED TO APPLY THE PROPER STANDARDS FOR SUMMARY JUDGMENT AND THEREFORE ITS GRANT OF SUMMARY JUDGMENT TO DEFENDANTS ON TABLACK'S CLAIMS WAS IN ERROR."
 {¶ 22} Tablack argues that, in this case, because the claims involve a heightened fiduciary duty by the defendants, the defendants had the burden of proof on the fairness of their actions. He contends that the trial court failed to assign the defendants the burden of proof and ignored the requirements set out by this court regarding the business judgment rule in Kellyv. Wellsville Foundry, Inc. (Dec. 6, 2000), 7th Dist. No. 99-CO-27. Tablack asserts that he presented evidence that both the 1993 and the 1998 Agreements were not, as the defendants alleged, retirement agreements. He points out that neither Agreement addressed the firm as a whole, but instead focused on him and his age.
 {¶ 23} In Kelly, we noted that the business judgment rule requires that a court shall not inquire into the wisdom of actions taken by directors in a corporation in the absence of fraud, bad faith, or abuse of discretion. However, a party may not claim the protection of the business judgment rule when it has breached its duty of loyalty. We found that in that case, the appellants, made up of the company and the majority shareholder, failed to demonstrate that they satisfied the duty of loyalty. Thus, we placed the burden on the company and majority shareholder to show that they did not breach the duty of loyalty owed to the minority shareholders in a close corporation.
 {¶ 24} In the present case, in granting summary judgment in favor of the defendants on Tablack's breach of fiduciary claim, the trial court stated that Tablack had the burden of proving that the other shareholders harmed his investment rights and had no legitimate business purpose for the conduct that he contended was a breach of their fiduciary duty to him as a minority shareholder. The court found that Tablack offered no evidence to satisfy this burden.
 {¶ 25} At first, this statement by the trial court appears to be in conflict with Kelly. But a further examination is required. In Kelly, this court was dealing with a case that had already been tried to the court. Here, however, the case was dismissed on summary judgment.
 {¶ 26} The Ohio Supreme Court set out the burdens of proof when considering motions for summary judgment in Dresher v.Burt (1996), 75 Ohio St.3d 280, 662 N.E.2d 264. The court stated:
 {¶ 27} "[W]e hold that a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence [emphasis sic.] of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Id. at 293.
 {¶ 28} In the present case, the trial court found the defendants presented evidence that demonstrated the absence of a genuine issue of material fact. It pointed to the 1993 and 1998 Agreements, which Tablack entered into voluntarily. Thus, since the defendants were able to cite to evidence that demonstrated that there was no genuine issue of material fact as to Tablack's breach of fiduciary claim, the burden then shifted to Tablack to set forth specific facts showing that there was a genuine issue for trial. Therefore, the trial court properly applied the burden-shifting test.
 {¶ 29} Furthermore, on appeal of an order granting summary judgment, an appellate court applies the same standard as the trial court. Thus, if the trial court applied the improper burden of proof, any harm will be corrected by this court's opinion. Because we review decisions granting summary judgment de novo, we can apply the proper burden-shifting test as set out inDresher. Accordingly, Tablack's first issue is without merit.
 {¶ 30} Tablack's third issue states:
 {¶ 31} "THE VISITING JUDGE ABUSED HIS DISCRETION WHEN HE REVERSED THE ORIGINAL JUDGE'S RULING AND GRANTED SUMMARY JUDGMENT TO DEFENDANTS."
 {¶ 32} JHS and Wellman filed motions for summary judgment on all claims in Tablack's original complaint. Tablack filed a motion to dismiss the counterclaims against him, which the trial court treated as a motion for summary judgment. On January 13, 2003, the trial court denied all motions for summary judgment, finding that genuine issues of material fact existed with regard to all causes of action.
 {¶ 33} Several months later, Tablack filed an amended complaint adding an age discrimination claim and amending his public policy tort claim to include his wrongful termination due to his age.
 {¶ 34} The case was subsequently assigned to a new, visiting judge. The new judge permitted JHS and Wellman to file summary judgment motions as to Tablack's new claims and to file motions for reconsideration of the court's previous summary judgment rulings.
 {¶ 35} The court held a hearing and subsequently entered judgments granting JHS's and Wellman's motions for summary judgment on Tablack's claims and granting Tablack's motion for summary judgment on JHS's and Wellman's claims.
 {¶ 36} Tablack first argues that the fact that one judge found that summary judgment was not proper, while a second judge found that it was proper demonstrates that reasonable minds can differ, thus making summary judgment inappropriate. He also argues that the second judge's reliance on Hellman v. EPLProlong, Inc. (2000), 139 Ohio App.3d 231, 743 N.E.2d 484, was misplaced. And he contends that the new judge should not have revisited the prior judge's ruling on summary judgment citing the law of the case.
 {¶ 37} On appeal, we will not reverse a trial court's determination of a motion for reconsideration absent an abuse of discretion. Servenack v. Sturgeon (Dec. 27, 2001), 7th Dist. No. 99-CA-53. Abuse of discretion connotes more than an error; it implies that the trial court's judgment is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983)5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 38} In Hellman, supra, this court stated: "Although Ohio's Civil Rules do not specifically provide for a motion for reconsideration of interlocutory orders of a trial court, the Ohio Supreme Court has stated that such a motion is a permissible procedural tool." Id. at 240 citing Pitts v. Ohio Dept. ofTransp. (1981), 67 Ohio St.2d 378, 380, 423 N.E.2d 1105, at fn. 1. We noted that this is consistent with the general rule that a trial court has plenary power to review its own interlocutory rulings before entering final judgment. Id. Furthermore, pursuant to Civ.R. 54(B), any order that adjudicates fewer than all of the claims between parties is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
 {¶ 39} An order denying a motion for summary judgment is not a final order. State ex rel. Overmeyer v. Walinski (1966),8 Ohio St.2d 23, 222 N.E.2d 312. It does not adjudicate all of the claims between parties. Thus, it is subject to a motion for reconsideration.
 {¶ 40} Appellant takes issue with the fact that the new judge reconsidered the previous judge's ruling. However, both decisions were decisions of the Mahoning County Common Pleas Court. We should not look at them as decisions of particular judges. According to the case law cited above, the trial court had the authority to reconsider the trial court's previous decision on the motions for summary judgment. Tablack can point to no evidence that in doing so, the trial court abused its discretion. Therefore, Tablack's third issue is without merit.
 {¶ 41} Tablack's fourth issue states:
 {¶ 42} "THE COURT IGNORED EVIDENCE PROPERLY SUBMITTED BY PLAINTIFF AND ERRED IN THE GRANT OF SUMMARY JUDGMENT TO DEFENDANTS."
 {¶ 43} On March 13, 2002, Tablack filed a motion to dismiss the defendants' counterclaims, which was ultimately converted into a motion for summary judgment. To this motion, Tablack attached an excerpt from Jeren's deposition for support. On August 7, 2002, Tablack filed a brief in opposition to the defendants' motions for summary judgment. In this brief, Tablack referenced Jeren's deposition and numerous exhibits from Jeren's deposition. That same day, Tablack filed Jeren's two-volume deposition and the accompanying 32 deposition exhibits. Additionally, although he did not cite them in his motion for summary judgment or his brief in opposition to summary judgment, Tablack filed the depositions of Hackett, Skoufatos, and Wellman on October 9, 2002.
 {¶ 44} The trial court then denied all motions for summary judgment.
 {¶ 45} In early March 2004, the defendants filed motions for reconsideration of the previous order denying them summary judgment and for summary judgment on Tablack's amended complaint. Tablack filed a brief in opposition, where he stated in a footnote that he was incorporating his previous response to the defendants' motions for summary judgment including all of the depositions and documents he previously filed. The court held a hearing on the motions. At the hearing, Tablack's counsel again referenced Jeren's, Hackett's, and Skoufatos's depositions. (Tr. 71-75).
 {¶ 46} In its May 12, 2004 judgment entry, which granted summary judgment to JHS and Wellman on Tablack's claims, the trial court stated that in response to the defendants' summary judgment motions, Tablack relied on "his briefs and oral arguments without any further evidentiary material."
 {¶ 47} In its July 27 judgment entry, which granted summary judgment to Tablack on the defendants' counterclaims, the trial court stated that it presumed that the materials that the defendants submitted to support their motion to reconsider were the same materials they submitted to support their original summary judgment motion. It further stated that Tablack relied on his briefs without any responsive evidentiary materials.
 {¶ 48} But in its August 24 judgment entry, which entered final judgment on all claims, the court stated:
 {¶ 49} "Contrary to the July 27 Opinion and Order, the Court now accepts as timely the plaintiff's evidentiary materials to support his summary judgment motion. Inasmuch as the July 27 order granted the plaintiff's summary judgment motion without relying on the plaintiff's evidentiary materials, there is no reason to modify that ruling with consideration of those materials."
 {¶ 50} Tablack argues that the court erred in failing to consider the evidence he submitted. He points out that he cited to depositions in his briefs in opposition to summary judgment. He claims that he submitted and re-submitted depositions and deposition exhibits in August and October 2002 and again in July 2004. He claims he filed an expert report in March 2004. Tablack argues that the court's failure to consider his properly submitted evidence requires a reversal of summary judgment.
 {¶ 51} The trial court stated that Tablack relied on his briefs and oral arguments without any further evidentiary materials. We can infer that the trial court considered the depositions Tablack filed. Tablack cited to Jeren's deposition and many of the accompanying exhibits in his original brief in opposition to summary judgment. In his second brief in opposition to summary judgment, Tablack incorporated by reference all of the depositions and exhibits. Additionally, the depositions were properly filed in the trial court and were a part of the record. Furthermore, at the hearing on the motion, Tablack again referenced the depositions.
 {¶ 52} Moreover, since this case is now before us on appeal from summary judgment, we review it de novo. Because we are inferring that the trial court considered all properly filed evidence, and the depositions and exhibits were properly filed, we will consider those depositions and exhibits in reaching our judgment in this case. Therefore, if those depositions and exhibits create a genuine issue of material fact as to any of Tablack's claims, this court will reverse the trial court's award of summary judgment. Accordingly, Tablack's fourth issue is without merit.
 TABLACK'S ALLEGED ISSUES ON THE MERITS {¶ 53} Tablack's remaining alleged errors, as well as JHS's and Wellman's assignments of error, are governed by the summary judgment standard of review.
 {¶ 54} In reviewing an award of summary judgment, appellate courts must apply a de novo standard of review. Cole v. Am.Indus. Resources Corp. (1998), 128 Ohio App.3d 546, 552,715 N.E.2d 1179. Thus, we shall apply the same test as the trial court in determining whether summary judgment was proper. Civ.R. 56(C) provides that the trial court shall render summary judgment if no genuine issue of material fact exists and when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. State ex rel. Parsonsv. Flemming (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377. A "material fact" depends on the substantive law of the claim being litigated. Hoyt, Inc. v. Gordon Assoc., Inc. (1995),104 Ohio App.3d 598, 603, 662 N.E.2d 1088, citing Anderson v. LibertyLobby, Inc. (1986), 477 U.S. 242, 247-248, 106 S.Ct. 2505,91 L.Ed.2d 202.
 FRAUD/BREACH OF FIDUCIARY DUTY {¶ 55} Tablack's second issue states:
 {¶ 56} "THE TRIAL COURT'S REFUSAL TO VIEW THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO PLAINTIFF IS CONTRARY TO THE REQUIREMENTS OF RULE 56, OHIO RULES OF CIVIL PROCEDURE."
 {¶ 57} Here, Tablack argues that the trial court did not construe the evidence in the light most favorable to him, as it was required to do. Tablack limits this argument to his claims for fraud and breach of fiduciary duty.
 {¶ 58} As to the fraud claim, Tablack notes that it is undisputed that under his fee-sharing agreement with Thomas Wellman prior to 1991, a $240,000 fee became payable to them. He notes that he agreed to split the fee three ways by including Jeren. However, he argues that he learned years later, that Wellman and Jeren had concealed the actual distribution of the fee from him. Tablack argues that Jeren admitted that he only received $68,000 from that fee and that he concealed this fact from Tablack, yet the trial court ignored this evidence. Tablack argues that Jeren's statement showed a concealment of material facts where there was a duty to disclose. Additionally, Tablack argues that the court failed to infer that he suffered a loss of $40,000 as a result of Wellman's and Jeren's fraud.
 {¶ 59} To prevail on a cause of action for fraud, the plaintiff must prove: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance.Geo-Pro Serv., Inc. v. Solar Testing Laboratories, Inc. (2001),145 Ohio App.3d 514, 526, 763 N.E.2d 664.
 {¶ 60} Tablack asserted his fraud claim only against Wellman and Jeren. The only evidence concerning this claim comes from Jeren's and Tablack's depositions and is as follows.
 {¶ 61} According to Tablack, before the firm was formed, he and Wellman had an oral agreement whereby they split any fees that originated from workers' compensation cases, including fees from any "spin-off" cases, fifty-fifty. (Tablack I dep. 31). In 1985, before the disputed fee was received, Tablack stated that Wellman approached him and asked him if they could split the $240,000 fee three ways with Jeren since Jeren did a lot of work on the case. (Tablack I dep. 87). Tablack agreed. (Tablack I dep. 87). Tablack stated that he fully agreed to accept $80,000 as his share of the $240,000 fee. (Tablack I dep. 87).
 {¶ 62} Tablack stated that he did not learn of the circumstances surrounding how the fee was divided until March 2001 when, during a conversation with Jeren, Jeren told him that he never received a full one-third of the fee from Wellman. (Tablack I dep. 71, 73). Tablack claimed that Jeren told him that he received only $68,000 of the fee. (Tablack I dep. 88). Therefore, Tablack deduced that Wellman kept $92,000 of the fee. (Tablack I dep. 87). However, nobody told Tablack that Wellman kept $92,000 of the fee, nor did Tablack have any evidence to substantiate this belief. (Tablack I dep. 89-90).
 {¶ 63} Significantly, counsel asked Tablack, "Did Jeren make any misrepresentations to you about the distribution of the Peters fee in the medical malpractice case?" to which Tablack responded "No." (Tablack I dep. 83-84).
 {¶ 64} According to Jeren, in 1985 the then-existing firm of Wellman Jeren received the $240,000 fee. (Jeren I dep. 62). They cut a check to Tablack for $80,000. (Jeren I dep. 62). The firm of Wellman Jeren retained the remaining $160,000. (Jeren I dep. 62-63).
 {¶ 65} Jeren stated that soon after the fee was distributed in 1985, he told Tablack that he had personally received $68,000 from the fee and that the remainder had been placed in the law firm for profit sharing and other expenses. (Jeren I dep. 64-65). Jeren claimed that he did not have such a conversation with Tablack in March 2001 as Tablack alleged. (Jeren I dep. 68).
 {¶ 66} As to Jeren, summary judgment was appropriate on this claim. Tablack admitted that Jeren made no misrepresentations to him regarding the fee at issue. In order to sustain a claim for fraud, Tablack had to have some evidence that Jeren falsely made a representation to him on which he relied. Since Tablack admitted that Jeren never misrepresented anything to him, the trial court properly granted summary judgment to JHS on the fraud claim.
 {¶ 67} As to Wellman, summary judgment was also proper. No evidence exists that Wellman falsely made a representation, or made a representation with utter disregard as to its truth, to Tablack regarding the fee. There is no evidence as to Wellman's state of mind when he asked Tablack to split the fee three ways by including Jeren. Furthermore, Tablack agreed to accept $80,000 of the $240,000 fee. Thus, Tablack cannot demonstrate that he was injured as a result of Wellman's representations to him. Moreover, in its judgment entry, the trial court noted that during the summary judgment hearing, Tablack's counsel admitted that Tablack would have sustained no damage if Wellman had paid Jeren more than $80,000 from the fee. Thus, it is hard to understand how Tablack was damaged when Wellman paid Jeren less than $80,000 from the fee. Additionally, no evidence exists that Wellman kept $92,000 for himself. The evidence only indicates that Jeren personally received $68,000 and the remainder was placed in Wellman Jeren's account for profit sharing and other expenses. Thus, the trial court properly granted Wellman's motion for summary judgment on this claim.
 {¶ 68} As to the breach of fiduciary duty claim, Tablack argues that the trial court ignored his deposition testimony where he stated that he was threatened into signing the 1993 Agreement. He contends that had the court construed the evidence in his favor, it would have found that the defendants, acting as a majority, pressured him into signing the 1993 Agreement.
 {¶ 69} To succeed on a claim of breach of a fiduciary duty, the plaintiff must prove the existence of a duty arising from a fiduciary relationship, a failure to observe the duty, and an injury resulting proximately therefrom. Culbertson v. WigleyTitle Agency, Inc., 9th Dist. No. 20659, 2002-Ohio-714; Strockv. Pressnell (1988), 38 Ohio St.3d 207, 216, 527 N.E.2d 1235. Generally, majority shareholders have a fiduciary duty to minority shareholders in a closely held corporation. Kelly, 7th Dist. No. 99-CO-27, citing Crosby v. Beam (1989),47 Ohio St.3d 105, 108, 548 N.E.2d 217. "`Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent a legitimate business purpose, is actionable.'" Id. quoting Crosby, 47 Ohio St.3d at 109.
 {¶ 70} Thus, this claim turns in part on whether JHS and Wellman had a legitimate business purpose in drafting and adopting the 1993 Agreement. Tablack can point to no evidence that the firm acted without a legitimate business purpose in adopting the 1993 Agreement.
 {¶ 71} One initiating event for the 1993 Agreement was that Thomas Wellman was going to have open-heart surgery and wanted to get a retirement agreement into place before his surgery. (Tablack I dep. 43, 46). Another reason for the Agreement was that the younger lawyers were looking at their futures at the firm and wanted a plan in place. Hackett had expressed to other members of the firm that he had been doing a lot of work, believed that his compensation should be increased, and wanted to know the firm's long-term plan. (Jeren I dep. 53-55; Hackett dep. 17-18). And Skoufatos looked at the 1993 Agreement as the firm's way of providing a long-term plan and guaranteeing the younger lawyers that their efforts would ultimately be rewarded. (Skoufatos dep. 20-21).
 {¶ 72} Tablack cannot point to any evidence that contradicts these two legitimate business purposes. The firm had a legitimate interest in having both a retirement plan and a long-term plan for its partners. The evidence Tablack asserts the trial court failed to construe in his favor does not change this.
 {¶ 73} At his deposition, counsel asked Tablack whether he voluntarily signed the 1993 Agreement. Tablack responded, "I wouldn't use the word `voluntarily,' no." (Tablack I dep. 40). When pressed, he stated that he did not sign the 1993 Agreement voluntarily. (Tablack I dep. 40). Tablack then stated that Jeren threatened him and put pressure on him to sign it. (Tablack I dep. 40). He stated that he was taken by surprise when, at a meeting in January 1993, Jeren stated that the firm was thinking about making 65 the retirement age. (Tablack I dep. 40). Tablack was to turn 65 in October of that year. (Tablack I dep. 40). He testified that he perceived a threat that the firm was going to kick him out at age 65. (Tablack I dep. 43). He also made it known to the other partners that he did not want to be forced to retire at 65. (Tablack I dep. 44).
 {¶ 74} Tablack stated that after the meeting, he received a draft of the 1993 Agreement. (Tablack I dep. 43). He made two changes to the draft, which the firm incorporated into the 1993 Agreement. (Tablack I dep. 45). He did not make any other changes to the draft other than the two that were incorporated. (Tablack I dep. 45). He further stated that he was not okay with the proposed agreement, but he could not remember whether he voiced his displeasure with it. (Tablack I dep. 45).
 {¶ 75} Importantly, Tablack never refused to sign the 1993 Agreement. (Tablack I dep. 45). He signed the 1993 Agreement on January 29, 1993 as both a shareholder and the firm's vice president. (Tablack I dep. 42; Pt. Ex. 18). He admitted that the reason he signed the 1993 Agreement was because he would continue to receive revenue between the ages of 65 and 70. (Tablack I dep. 47). Tablack also admitted that he had input into the 1993 Agreement. (Tablack I dep. 47-48).
 {¶ 76} This testimony lends further credence to the court's grant of summary judgment on this claim. Although Tablack stated that he was pressured into signing the 1993 Agreement, his actions demonstrated otherwise. Tablack made his position known to the other partners that he did not want to retire at 65. He also made two changes to the draft of the 1993 Agreement before signing it. The firm considered and addressed Tablack's concerns. The 1993 Agreement did not retire Tablack until age 70 and it incorporated his suggested changes. And Tablack signed the Agreement both as a shareholder and as the firm's vice president. Given Tablack's actions, we cannot conclude that the other shareholders breached the fiduciary duty owed to him. Therefore, summary judgment was appropriate.
 {¶ 77} Thus, Tablack's second issue for review is without merit.
 {¶ 78} Tablack's fifth issue for review states:
 {¶ 79} "THE COURT ERRED IN FINDING THAT TABLACK RATIFIED DEFENDANTS [sic.] BREACH OF THEIR HEIGHTENED DUTY OWED TO TABLACK."
 {¶ 80} Tablack argues that one of the issues that should be decided by a fact-finder is whether the owners of less than 50 percent of the shares of a close corporation individually can act as a majority when acting together. He contends that the defendants, as the majority shareholders, owed him, as the minority shareholder, a heightened fiduciary duty. Tablack argues that the evidence demonstrated that the defendants used their majority control to their benefit, without providing him any benefit.
 {¶ 81} Tablack further argues that the defendants used the term "retirement plan" as a pretext to discriminate against him based on his age. For support, Tablack points out that the 1993 Agreement provides no retirement benefits to him. He contends that whether the 1993 Agreement was an age-based termination agreement or a retirement agreement is a question of fact for a jury.
 {¶ 82} As noted above, when majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, that breach is actionable absent a legitimate business purpose. Crosby, 47 Ohio St.3d 109.
 {¶ 83} In Herbert v. Porter, 3d Dist. No. 13-05-15,2006-Ohio-355, the Third District analyzed a situation where a 50-percent shareholder in a close corporation alleged that the other shareholders had breached the heightened duty owed to her. In that case, Porter owned 50 percent of the shares in the close corporation and the remaining 50 percent of the shares were divided equally between the Herberts, who are husband and wife. The Herberts were unhappy with the arrangement of the corporation and filed a complaint for various claims, including a judicial dissolution of the corporation. Porter counterclaimed, arguing that the Herberts breached their fiduciary duty to her by calling for a "sham" shareholder meeting to elect new directors, when their sole purpose was to create a voting deadlock so they could obtain a judicial dissolution of the corporation. The matter went to a jury trial and the jury found that the Herberts breached the fiduciary duty owed to Porter by creating a deadlock after filing a claim for judicial dissolution of the corporation. The Herberts appealed arguing that Porter was precluded from bringing this claim because her only asserted rationale for finding a breach of fiduciary duty was based on the fact that the Herberts sought and obtained a judicial dissolution of the corporation.
 {¶ 84} The appellate court reversed. It first found that Porter was not a minority shareholder. Id. at ¶ 13. It pointed out that the shares of the corporation were divided evenly between Porter and the Herberts, each side owning 50 percent. Id. Therefore, the court concluded that the "heightened" fiduciary duty did not apply because Porter was not in the vulnerable position of being a minority shareholder. Id. It then continued:
 {¶ 85} "The heightened fiduciary duty exists because of the precarious position the minority shareholder is in; since Porter is not in this position in the instant case there can be no breach of this duty. Practically speaking, the Herberts simply could not act to deprive Porter of the profits of the corporation while reserving all of the profits for themselves. There was no way to `freeze-out' Porter, because the Herberts were not in a majority ownership position. What occurred in the instant case was not a `freeze-out' of Porter from the profits of PRO. Rather, Porter's essential argument is that she was deprived of the future benefits she foresaw as a PRO shareholder. Porter's argument is that the shares of PRO became essentially worthless after the trial court ordered that the company be dissolved. At that point, both parties were entitled to their proportionate share of the assets of the corporation, but there would no longer be any future `profits' to distribute between the parties; there would be no more income from the company's clients.
 {¶ 86} "Potential future income is not what the `heightened'fiduciary duty was meant to protect. This duty only protects the minority from being frozen out of recognized profits through bad faith doings of the majority. See Estate of Schroer [v.Stampco Supply, Inc. (1984)], 19 Ohio App.3d [34,] at 38-39,482 N.E.2d 975. There is nothing in the record to demonstrate that Porter was denied the recognized profits of PRO; she received salary and bonuses, she was not denied any dividends, and she received her proportionate share of the assets of the company upon dissolution. However, Porter is not entitled to a share of the future profits of the company — these profits have not yet been earned and are not a part of the dissolution of PRO." (Emphasis added.) Id. at ¶ 14-15.
 {¶ 87} Similarly, in this case, the other shareholders did not owe a "heightened" duty to Tablack. Before the parties adopted either of the Agreements, Tablack owned 30 percent of the shares, Wellman owned 30 percent, Jeren owned 20 percent, and Skoufatos and Hackett each owned 10 percent. Thus, Tablack and Wellman together controlled the majority of the shares. Tablack argues that Wellman, along with JHS, owned the majority of the shares and used their majority status to breach their duty to him. However, both Agreements affected Wellman in the same way they affected Tablack. Thus, it would seem that Wellman's interests would have been aligned with Tablack's interests. Furthermore, as the Third District stated, the "heightened" fiduciary duty was not meant to protect potential future income. Potential future income is exactly what Tablack is asserting that JHS and Wellman took away from him when they pushed for and adopted the Agreements.
 {¶ 88} One other point should be mentioned here. Tablack asserts that JHS and Wellman used their "majority" status to their benefit without providing any benefits to him. This is simply untrue. Both Agreements contain provisions providing for benefits to Tablack's spouse in event of his death and providing for healthcare for Tablack up through the times set out in the Agreements. And it was Tablack himself who initiated the 1998 Agreement, which the others went along with.
 {¶ 89} Thus, while JHS and Wellman owed Tablack a fiduciary duty, it was not a heightened duty as he alleges. This, taken together with the discussion of Tablack's breach of fiduciary duty claim as set out previously, again leads to the conclusion that summary judgment on this claim was proper. Accordingly, Tablack's fifth issue for review is without merit.
 STATUTE OF LIMITATIONS {¶ 90} Tablack's sixth issue for review states:
 {¶ 91} "TABLACK'S CLAIMS ARE NOT TIME BARRED AND THE TRIAL COURT DID NOT PROPERLY IDENTIFY THE DATE ON WHICH THE STATUTE OF LIMITATIONS COMMENCED."
 {¶ 92} This argument relates to Tablack's claims for breach of fiduciary duty, age discrimination, and public policy tort. He contends that the court did not properly determine when the statute of limitations began to run for these claims. Tablack argues that after the 1993 Agreement went into effect, with each paycheck he was a victim of breach of fiduciary duty, age discrimination, and public policy tort again and again. Since he filed his complaint on October 4, 2001, Tablack asserts the claim extends back to October 4, 1997, as he asserts that a four-year statute of limitations applies.
 {¶ 93} Tablack filed his initial complaint on October 4, 2001. In that complaint, he asserted five claims: (1) breach of fiduciary duty; (2) breach of contract; (3) fraud and/or promissory estoppel; (4) age discrimination public policy torts; and (5) public policy tort for the non-competition restrictions placed on him by the Agreements. He filed his first amended complaint on February 10, 2004. In that complaint, Tablack amended count four to include statutory age discrimination under R.C. 4112.02(N).
 {¶ 94} The statute of limitations for claims of breach of fiduciary duty is four years. R.C. 2305.09; Kondrat v. Morris
(1997), 118 Ohio App.3d 198, 207, 692 N.E.2d 246.
 {¶ 95} The breach of fiduciary duty claim arose when JHS and Wellman allegedly persuaded Tablack to sign the 1993 Agreement. This is the event that Tablack points to as triggering their breach of fiduciary duty. (Tablack I dep. 40-44). This court has previously found that a plaintiff's cause of action for breach of fiduciary duty arises when the act or commission constituting the breach of duty occurs. Helman v. EPL Prolong, Inc. (2000),139 Ohio App.3d 231, 249, 743 N.E.2d 484; Hirschl v. Evans (March 27, 1996), 7th Dist. No. 94-CA-43. We noted that "to find that appellant's causes of action arose when he suffered his loss would be, on this court's part, an unlegislated adoption of the discovery rule in instances not specifically set forth in R.C. 2305.09." Hirschl, supra.
 {¶ 96} Tablack filed this case more than eight years after the alleged breach of fiduciary duty occurred. Thus, this claim was time-barred. Additionally, as discussed above, even if Tablack timely asserted a breach of fiduciary duty claim, summary judgment was proper nonetheless.
 {¶ 97} The statute of limitations for an age discrimination claim based on a violation of R.C. Chapter 4112 is 180 days. R.C.4112.02(N); Bellian v. Bicron Corp. (1994), 69 Ohio St.3d 517,634 N.E.2d 608.
 {¶ 98} The Ohio Supreme Court has held: "The statute of limitations period applicable to age-discrimination claims brought under R.C. Chapter 4112 begins to run on the date of the employee-plaintiff's termination from the defendant-employer."Oker v. Ameritech Corp. (2000), 89 Ohio St.3d 223,729 N.E.2d 1177, at the syllabus.
 {¶ 99} JHS, however, cites to cases where courts have held that in order to determine whether a claim is timely filed, the focus should be on the time that the discriminatory act actually occurs. McCray v. City of Springboro (July 13, 1998), 12th Dist. No. CA 98-01-006. "Specifically, `an age discrimination claim, pursuant to R.C. 4112.02(A), accrues, and the 180-day limitation period under R.C. 4112.02(N) commences, when the discriminatory act or practice occurs, not when adverse consequences or other facts resulting therefrom manifest themselves.'" Id., quoting Berarducci v. Oscar Mayer FoodsCorp. (Aug. 17, 1984), 6th Dist. No. E-84-2. This rule applies when there was a single discriminatory act alleged by the plaintiff, and all subsequent acts by the employer were merely ministerial consequences of that act. Jones v. Goodyear Tire andRubber Co., 9th Dist. No. 21724, 2004-Ohio-2821, at ¶ 14. If the complaint alleges discrete discriminatory acts, each discrete act can trigger a new limitations period. Id., citing NationalRailroad Passenger Corp. v. Morgan (2002), 536 U.S. 101, 122,122 S.Ct. 2061, 153 L.Ed.2d 106. Some examples of discrete discriminatory acts include termination, failure to promote, denial of transfer, or refusal to hire. Id. at ¶ 15, citingMorgan, 536 U.S. at 114.
 {¶ 100} In this case, Tablack alleged two discrete discriminatory acts — pressuring him into signing the 1993 Agreement and pressuring him into signing the 1998 Agreement. The issuance of each paycheck after the Agreements were executed was merely a ministerial act. Each time the firm issued Tablack a paycheck, it was not engaging in a new discriminatory act. It was merely carrying out the terms of the Agreements. It was the adoption of the Agreements that set Tablack's retirement age and regulated his pay rate.
 {¶ 101} The 1993 Agreement was executed on January 29, 1993 and the 1998 Agreement was executed on January 23, 1998. Thus, in order to timely file a claim based on R.C. 4112.02, Tablack would have had to assert it by July 22, 1998. Tablack did not file his initial complaint until October 4, 2001, well beyond the limitations period. Accordingly, Tablack's statutory age discrimination claim is time-barred.
 {¶ 102} The statute of limitations for a public policy tort for wrongful discharge is somewhat of an issue. Tablack asserts that his claim was subject to a four-year statute of limitations. The trial court applied a 180-day statute of limitations.
 {¶ 103} The trial court relied on the Ohio Supreme Court's holding that, "[a]ny age discrimination claim, premised on a violation described in R.C. Chapter 4112, must comply with the one-hundred-eighty-day statute of limitations period set forth in former R.C. 4112.02(N)." Bellian, 69 Ohio St.3d at the syllabus. In that case, Bellian argued that he brought his age discrimination claim under R.C. 4112.99. He claimed that he did not have to comply with the express limitations period prescribed by R.C. 4112.02(N) because he brought his claim under the more general discrimination provision which does not contain a limitations period. The Court, applying rules of statutory construction, concluded that the specific provision of R.C.4112.01(N) applied over the more general provision of R.C.4112.99. Id. at 519. The Court noted that R.C. 4112.02(N) provides that an aggrieved party "may enforce his rights relative to discrimination on the basis of age as provided for in thissection by instituting a civil action, within one hundred eighty days" after the alleged discriminatory act. (Emphasis sic.) Id. at 520. It concluded that this language makes it clear that any age-based discrimination claim, premised on a violation described in R.C. Chapter 4112, must comply with the 180-day limitations period set forth in R.C. 4112.02(N). Id.
 {¶ 104} But the trial court may have erred in applying a 180-day statute of limitations in this case. Unlike the plaintiff in Bellian, Tablack did not assert a claim under R.C. 4112.99. Instead he asserted a public policy claim.
 {¶ 105} In Pytlinski v. Brocar Prod., Inc.,94 Ohio St.3d 77, 760 N.E.2d 385, 2002-Ohio-66, the Ohio Supreme Court was called upon to determine whether the 180-day limitation period set forth in R.C. 4113.52 applied to Pytlinski's common-law claim for wrongful discharge in violation of public policy when Pytlinski asserted that he was terminated in violation of Ohio's public policy, which prohibits the termination of employees for lodging complaints pertaining to violations of the law, including OSHA regulations. Pytlinski claimed that he was discharged in violation of public policy favoring workplace safety because his discharge was predicated upon his complaints regarding workplace safety. He argued that he was asserting a common law cause of action governed by the four-year statute of limitations set out in R.C. 2305.09(D).
 {¶ 106} The Court found that the 180-day limitations period did not apply. It noted that an at-will employee who is discharged for filing an OSHA complaint alleging concerns with workplace safety is entitled to maintain a common-law tort action and that retaliation against an employee who files a complaint regarding workplace safety contravenes Ohio's public policy. Id. at 79-80. The Court then held: "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted. Therefore, Pytlinski is not bound by the statute of limitations set forth in R.C. 4113.52 because his cause of action is not based upon that statute, but is, instead, based in common law for violation of public policy." Id. at 80.
 {¶ 107} After concluding that the 180-day limitations period did not apply, the Court held that since an action for wrongful discharge in violation of public policy is not specifically covered by any statutory section, the general limitations period for tort actions not specifically covered by other statutory sections applied. Id. That limitations period is four years. Id., citing R.C. 2305.09(D).
 {¶ 108} The same reasoning applies here. As long as Tablack relied on some source of public policy other than R.C. 4112.02
for his wrongful discharge claim, the four-year limitations period applies. In his first amended complaint, Tablack asserted that the Agreements were contrary to Ohio's strong public policy, including the common law of Ohio, provisions of R.C. 4112.02(N), the Older Workers Benefit Protection Act (OWBPA), and other federal and state laws.
 {¶ 109} Thus, while Tablack relied in part on R.C. 4112.02 as his source of public policy, he also relied on the OWBPA. Therefore, his wrongful discharge claim is not bound by the 180-day limitations period set out in R.C. 4112.01(N). Instead, the claim is governed by the four-year general limitations period set out in R.C. 2305.09(D).
 {¶ 110} Since the four-year limitations period applies, we must next determine when Tablack's wrongful discharge claim arose. Since he filed his complaint on October 4, 2001, as long as Tablack's claim arose after October 4, 1997, it is timely. Here Tablack again argues that his claim was extended with each paycheck he received. And again, it seems that these were simply ministerial acts and that any discrimination that occurred was a result of the executing of the Agreements. However, whether the discriminatory act was his actual retirement, which occurred in 2003, or the execution of the 1998 Agreement, both events were with within the limitations period. The only event that is time-barred is the execution of the 1993 Agreement.
 {¶ 111} In summary, Tablack's claims for breach of fiduciary duty and statutory age discrimination are time-barred while his claim for wrongful discharge in violation of public policy is not. Accordingly, it appears that Tablack's sixth issue has merit as it relates to the statute of limitations regarding his wrongful discharge in violation of public policy. However, this is not a reversible error because, as we shall see in Tablack's next issue for review, summary judgment on this claim was proper nonetheless.
 PUBLIC POLICY TORT/AGE DISCRIMINATION {¶ 112} Tablack's seventh issue for review states:
 {¶ 113} "IN OHIO, WHEN A PARTNERSHIP AGREEMENT TERMINATES AN EMPLOYEE BECAUSE OF AGE IT CONSTITUTES A PUBLIC POLICY TORT AND A STATUTORY AGE DISCRIMINATION CLAIM UNDER ORC § 4112.02(N)."
 {¶ 114} Tablack first argues that the existence of statutory remedies does not bar a remedy for a common law wrongful discharge action. He additionally argues that since the defendants rely on the 1993 and 1998 Agreements as a type of waiver on his part, those Agreements have to comply with the OWBPA, which outlines mandatory requirements of a valid waiver of statutory age claims. Tablack asserts that the Agreements at issue do not contain the necessary requirements. Thus, they are voidable by him.
 {¶ 115} Tablack and JHS both rely on the Ohio Supreme Court case of Greeley v. Miami Valley Maintenance Contractors, Inc.
(1990), 49 Ohio St.3d 228, 551 N.E.2d 981, to support their positions regarding the public policy claim. In Greeley, the Court held:
 {¶ 116} "1. Public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute.
 {¶ 117} "2. Henceforth, the right of employers to terminate employment at will for `any cause' no longer includes the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy.
 {¶ 118} "3. In Ohio, a cause of action for wrongful discharge in violation of public policy may be brought in tort." Id. at paragraphs one, two, and three of the syllabus.
 {¶ 119} JHS asserts that Greeley makes clear that only employees at will may maintain a cause of action for termination in violation of public policy. Tablack, on the other hand, argues that Greeley stands for the proposition that any employee can bring such a cause of action. It seems that Tablack was not an employee at will.
 {¶ 120} In a subsequent case, construing and followingGreeley, the Court held that in order for an employee to bring a cause of action pursuant to Greeley the employee must have been an employee at will. Haynes v. Zoological Soc. ofCincinnati (1995), 73 Ohio St.3d 254, 652 N.E.2d 948, at the syllabus. In that case, Haynes was a union member, not an employee at will, who attempted to assert a Greeley claim against her employer. The Court stated:
 {¶ 121} "Greeley provides an exception to theemployment-at-will doctrine. Thus, as stated above, in order for an employee to bring a cause of action pursuant to Greeley,supra, that employee must have been an employee at will. The identifying characteristic of an employment-at-will relationship is that either the employer or the employee may terminate the employment relationship for any reason which is not contrary to law. Haynes clearly does not qualify as an employee at will. As a member of a union, the terms of her employment relationship were governed by a collective bargaining agreement. That agreement specifically limited the power of the zoo to terminate Haynes and, as a result, took her outside the context of employment at will. Because she was not an employee at will, she is outside the class of employees for whom Greeley provides protection." (Internal citations omitted; Emphasis sic.) Id. at 258.
 {¶ 122} Although Tablack was not a union member like Haynes, he was nonetheless not an employee at will. Tablack was a shareholder and vice president of the firm. (Tablack I dep. 46, 53). The firm could not have simply terminated Tablack at any time. Majority shareholders in a close corporation may not terminate minority shareholders without a legitimate business purpose. Wrightsel v. Ross-Co Redi-Mix, Inc. (March 26, 1993), 4th Dist. No. 1791; B. W. Custom Cabinets, Inc. v.Worthington (Apr. 23, 1992), 8th Dist. Nos. 59801 and 60709;Gigax v. Repka (1992), 83 Ohio App.3d 615, 615 N.E.2d 644. Because Tablack was not an employee at will, but instead was a shareholder and corporate office holder, he cannot assert aGreeley claim for wrongful termination in violation of public policy.
 {¶ 123} And as stated above, Tablack's statutory age discrimination claim is barred by the 180-day statute of limitations. Therefore, the trial court properly granted summary judgment to JHS and Wellman on both Tablack's statutory and public policy discrimination claims.
 {¶ 124} Accordingly, Tablack's seventh issue is without merit.
 {¶ 125} For the foregoing reasons, Tablack's four assignments of error are without merit. Accordingly, the trial court's judgment granting summary judgment in favor of JHS and Wellman on Tablack's claims is hereby affirmed.
 DEFENDANTS' ALLEGED ERRORS ON THE MERITS {¶ 126} Next, JHS raises four assignments of error. Wellman also raises one assignment of error, which encompasses JHS's four assignments of error. Thus, we will include it in the discussion of JHS's assignments of error. It states:
 {¶ 127} "THE TRIAL COURT ERRED AS A MATTER OF LAW IN CONCLUDING THAT NO GENUINE ISSUE OF MATERIAL FACT REMAINED TO BE LITIGATED ON CROSS-APPELLANT WELLMAN'S COUNTERCLAIMS."
 MALICIOUS PROSECUTION {¶ 128} The first of JHS's assignments of error states:
 {¶ 129} "THE TRIAL COURT ERRED IN GRANTING THE PLAINTIFF-APPELLANT/CROSS-APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIMS OF JOHN A. JEREN, JR., TIMOTHY R. HACKETT, AND NIKITAS SKOUFATOS FOR MALICIOUS CIVIL PROSECUTION."
 {¶ 130} JHS and Wellman claim that Tablack's claims against them were without any factual or legal basis. They point out that the trial court granted summary judgment in their favor on each of Tablack's claims.
 {¶ 131} To prove a case of malicious prosecution, the plaintiff must demonstrate: (1) the malicious institution of prior proceedings by the defendant against the plaintiff; (2) a lack of probable cause for the filing of the prior lawsuit; (3) termination of the prior proceedings in plaintiff's favor; and (4) seizure of plaintiff's person or property during the course of the prior proceedings. Crawford v. Euclid Nat. Bank (1985),19 Ohio St.3d 135, 139, 483 N.E.2d 1168.
 {¶ 132} In a malicious prosecution case, actual malice may be inferred from proof of lack of probable cause. Koss v. TheKroger Co., 10th Dist. No. 03AP1-199, 2004-Ohio-3595.
 {¶ 133} JHS and Wellman cannot point to any evidence to support the fourth element — seizure of their person or property during the course of the proceedings. The Ohio Supreme Court recognized the importance of this element noting that it prevents an explosion of claims that would result from every successful summary judgment defendant being tempted to file a malicious prosecution claim. Robb v. Chagrin Lagoons Yacht Club, Inc.
(1996), 75 Ohio St.3d 264, 270, 662 N.E.2d 9. The Court then reiterated, "[a] cause of action for malicious civil prosecution will lie only in cases where there is a prejudgment seizure of property, i.e., where there essentially has been a judgment against, and a concomitant injury suffered by, a defendant before he has had a chance to defend himself." Id.
 {¶ 134} JHS and Wellman did not submit any evidence that they essentially suffered a judgment against them and suffered a seizure of property before they could defend themselves. They point to two alleged seizures of property to support this element. First, they claim Tablack induced them to sign the 1998 Agreement, which decreased their earnings and increased Tablack's earnings. Even if Tablack induced the other partners to sign the 1998 Agreement, this took place in early 1998. Tablack did not institute the proceedings until October 2001. Thus, any inducement did not occur during the course of the proceedings
as is required under Crawford, supra.
 {¶ 135} Second, JHS and Wellman assert that Tablack failed to surrender his 150 shares in the firm upon reaching age 75, as required by the 1998 Agreement. But if Tablack refused to surrender his shares in accordance with the 1998 Agreement, JHS and Wellman would simply have a breach of contract action against him, not a claim for malicious prosecution. Additionally, JHS merely makes the statement that Tablack has refused to surrender his shares. They have not pointed to any evidence in the record to support this assertion.
 {¶ 136} Thus, the trial court properly found that JHS and Wellman did not offer any evidence to support their malicious prosecution claims and appropriately granted Tablack summary judgment on these claims. Accordingly, JHS's first assignment of error is without merit.
 ABUSE OF PROCESS {¶ 137} JHS's second assignment of error states:
 {¶ 138} "THE TRIAL COURT ERRED IN GRANTING THE PLAINTIFF-APPELLANT/CROSS-APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIMS OF JOHN A. JEREN, JR., TIMOTHY R. HACKETT, AND NIKITAS SKOUFATOS FOR ABUSE OF PROCESS."
 {¶ 139} Here JHS and Wellman argue that Tablack filed this lawsuit for an "ulterior purpose." They point out that Tablack admitted that the 1998 Agreement was prepared at his request and that he voluntarily signed it and was happy with it. (Tablack dep. 48-49, 53, 57-58). They argue that in an attempt to receive more compensation from the firm, Tablack now wants to disclaim the Agreement that he requested. They assert that Tablack's purpose in filing this lawsuit is to coerce and force the firm to comply with his demands of additional compensation not contemplated in the 1998 Agreement. They also claim that because of Tablack's lawsuit, they have incurred costs and their firm has suffered.
 {¶ 140} To prove a claim for abuse of process, the plaintiff must prove three elements: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process."Yaklevich v. Kemp, Schaeffer Rowe Co., L.P.A. (1994),68 Ohio St.3d 294, 298, 626 N.E.2d 115. While malicious prosecution refers to the improper initiation of a lawsuit, abuse of process deals with the use of a properly initiated lawsuit for an improper purpose. Robb, 75 Ohio St.3d at 271.
 {¶ 141} Firstly, it should be noted that this claim appears to be incompatible with the malicious prosecution claim. One of the elements a plaintiff must prove in a malicious prosecution case is a lack of probable cause for the filing of the lawsuit. One of the elements a plaintiff must prove for an abuse of process claim is that a legal proceeding has been set in motion in proper form and with probable cause. Thus, these claims appear to be contradictory to each other.
 {¶ 142} Secondly, JHS states in their brief that Tablack's claims "were utterly without any factual or legal basis." They then go on to argue that Tablack lacked probable cause to file any of his claims. By making this argument, JHS defeats their own claim of abuse of process since they assert that one of the necessary elements does not exist.
 {¶ 143} Thirdly, JHS and Wellman can point to no evidence that Tablack is using this lawsuit to accomplish an ulterior purpose. It seems clear that Tablack is seeking monetary damages that he believes he is entitled to due to the actions of JHS and Wellman. JHS asserts that "Tablack is attempting to use this lawsuit to coerce and exert power over the corporation that his voting rights do not otherwise allow him to do" and Wellman continues that "Tablack's ulterior purpose is to force the other shareholders to comply with his demand of additional compensation not contemplated by the parties' previous agreements." Yet neither party points to any evidence in the record to support these conclusory statements.
 {¶ 144} For these reasons, the trial court did not err in granting summary judgment in favor of Tablack on the abuse of process claims. Accordingly, JHS's second assignment of error is without merit.
 SANCTIONS FOR FRIVOLOUS CONDUCT {¶ 145} JHS's third assignment of error states:
 {¶ 146} "THE TRIAL COURT ERRED IN GRANTING THE PLAINTIFF-APPELLANT/CROSS-APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIMS OF JOHN A. JEREN, JR., TIMOTHY R. HACKETT, AND NIKITAS SKOUFATOS FOR FRIVOLOUS CONDUCT IN VIOLATION OF R.C. § 2323.51."
 {¶ 147} JHS and Wellman argue that they are entitled to sanctions because Tablack engaged in frivolous conduct meant only to harass them. They note that the parties conducted substantial discovery after Tablack filed his complaint, including taking Tablack's deposition. Tablack filed his amended complaint two years later, and JHS argues that many of the allegations Tablack set forth in his amended complaint were in direct contradiction of his deposition testimony. JHS notes that they have spent over $100,000 defending Tablack's frivolous claims and argue that they are entitled to recover these fees as sanctions.
 {¶ 148} The trial court found that no basis existed for frivolous conduct sanctions. First, it concluded that while Tablack's claims lacked merit, nothing demonstrated that any claim obviously served to merely harass or maliciously injure another party. It further found that it had no reason to conclude that Tablack lacked a good faith belief that he could prevail on any claim with an extension, modification, or reversal of existing law, if not on the basis of existing law.
 {¶ 149} Second, the court stated that R.C. 2323.51 does not define frivolous conduct to include the assertion of a claim that is not well grounded in fact and cited Riston v. Butler,149 Ohio App.3d 390, 777 N.E.2d 857, 2002-Ohio-2308, at ¶ 27, andRichmond Glass Aluminum Corp. v. Wynn (Sept. 5, 1991), 7th Dist. No. 90-C-46, to support its judgment. However, since the court's judgment, the Legislature has amended R.C. 2323.51. As of April 7, 2005, it now includes under the definition of frivolous conduct, the following:
 {¶ 150} "(iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.
 {¶ 151} "(iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief." R.C. 2323.51(A)(2)(a)(iii)(iv).
 {¶ 152} But at the time the court entered its judgment it was correct. And there is no indication that the addition to R.C.2323.51(A)(2)(a) is to be applied retroactively. Therefore, the trial court correctly awarded summary judgment to Tablack on the frivolous conduct claims. Accordingly, JHS's third assignment of error is without merit.
 DECLARATORY JUDGMENT {¶ 153} JHS's fourth assignment of error states:
 {¶ 154} "THE TRIAL COURT ERRED IN GRANTING THE PLAINTIFF-APPELLANT/CROSS-APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIMS OF JOHN A. JEREN, JR., TIMOTHY R. HACKETT, AND NIKITAS SKOUFATOS FOR DECLARATORY JUDGMENT."
 {¶ 155} In its July 27, 2004 judgment entry, the trial court found that by the terms of the 1993 and 1998 Agreements, their effect on Tablack's interests had expired. Therefore, it ruled that JHS's and Wellman's claims for declaratory relief were moot. In their amended complaint, JHS asked for a declaration that Tablack surrender his shares in the firm. JHS argues that Tablack retained the shares in violation of the 1998 Agreement.
 {¶ 156} "[C]ourts of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for under this chapter. The declaration may be either affirmative or negative in form and effect. The declaration has the effect of a final judgment or decree." R.C. 2721.02(A).
 {¶ 157} The 1998 Agreement clearly provides that Tablack shall surrender his 150 shares of stock in the firm upon attaining age 75. (Pt. Ex. 16D).
 {¶ 158} R.C. 2721.04 provides "a contract may be construed by a declaratory judgment or decree either before or after there has been a breach of the contract."
 {¶ 159} However, JHS has not pointed to any evidence in the record that Tablack has failed to surrender his shares. Absent some such evidence, summary judgment would not be appropriate.
 {¶ 160} Wellman's argument surrounding this issue is somewhat different. She notes that while Tablack has reached retirement age under the 1998 Agreement, her husband, if he was still living, would not yet have reached retirement age. Therefore, she contends that the 1998 Agreement still governs her entitlement to a percentage of her late husband's compensation and medical insurance.
 {¶ 161} In her counterclaim, Wellman requested a declaration that the 1998 Agreement is still valid and in effect.
 {¶ 162} Throughout this litigation, the 1998 Agreement has never been held to be invalid. Furthermore, no party has claimed that the 1998 Agreement does not apply to Wellman. There appears to be no reason why it would not still be in effect as it relates to Wellman's entitlement to her late husband's benefits. Thus, no declaration is necessary.
 {¶ 163} Accordingly, JHS's fourth assignment of error is without merit. Furthermore, Wellman's sole assignment of error also is without merit.
 {¶ 164} For the reasons stated above, the trial court's judgment granting summary judgment in favor of Tablack on JHS's and Wellman's claims is hereby affirmed.
Vukovich, J., concurs.
DeGenaro, J., concurs.
[1] Thomas Wellman was a partner in the firm. However, he has since passed away and Jeanne Wellman is his successor.