[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 264.]

ROBB ET AL., APPELLEES, *v*. CHAGRIN LAGOONS YACHT CLUB, INC., ET AL.
APPELLANTS.

[Cite as *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 1996-Ohio-189.]

*Torts—Malicious prosecution—Elements stated, including seizure of person or property.*

In order to state a cause of action for malicious civil prosecution in Ohio, four essential elements must be alleged by the plaintiff: (1) malicious institution of prior proceedings against the plaintiff by defendant, (2) lack of probable cause for the filing of the prior lawsuit, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings. (*Crawford v. Euclid Natl. Bank* [1985], 19 Ohio St.3d 135, 19 OBR 341, 483 N.E.2d 1168, followed; *Trussell v. General Motors Corp.* [1990], 53 Ohio St.3d 142, 559 N.E.2d 732, distinguished.)

(No. 94-2141—Submitted December 13, 1995—Decided March 6, 1996.)

APPEAL from the Court of Appeals for Lake County, No. 92-L-064.

————————————

{¶ 1} The facts of this case are more intricate than the libretto of "The H.M.S. Pinafore" and as full of intrigue and betrayal as "Mutiny on the Bounty." Appellant Chagrin Lagoons Yacht Club, Inc. ("club") is a nonprofit corporation located in Eastlake, Ohio. The club's present constitution was adopted in April 1984. Section 1, Article 2 of the club constitution sets forth the five different classes of membership in the club. Class B members have the right to vote on various club matters, including the election of officers and trustees. Class B members also have the right to be a candidate for any of the seven offices in the club hierarchy and to serve as a trustee. The office of Commodore is the club's

highest ranking office. The board of trustees consists of fourteen members, including the seven present officeholders, the immediate past Commodore, and six other elected members.

{¶ 2} In order to qualify as a Class B member, an individual must be the bona fide owner or co-owner of a boat that is docked on the club premises. If a Class B owner ceases to own a boat and does not purchase another before the end of the next calendar year, he sinks to Class C membership. A Class C member has none of the office-holding or voting rights of a Class B member.

{¶ 3} Prior to September 1991, appellants Jack Reese and Harry Faint, as well as appellees Frank Robb, Charles Patterson, James Graham (now deceased), Donald Miller and Robert Stickle, were all Class B members of the club. According to the parties, in 1988, Faint had been Commodore; in 1989, it seems Patterson held the office. In December 1989, a dispute arose as to whether Faint was qualified to be elected Commodore again, because there was some concern as to whether Faint qualified for Class B membership. A grievance was held on the matter, with the board deciding that Faint was qualified to serve. However, all was not shipshape.

{¶ 4} Patterson filed an action in the trial court against the club and Faint, seeking removal of Faint from the office of Commodore. The court dismissed the action as to both defendants. On February 26, 1990, Patterson, this time joined by Robb, Miller, Graham and Sherrill Flood, filed another action against Faint and the club, making the same basic allegations as before. On May 17, 1991, the trial court dismissed that case on the grounds of *res judicata*. The Lake County Court of Appeals affirmed. (*Robb v. Faint* [Dec. 31, 1992], Lake App. No. 91-L-078, unreported.)

{¶ 5} Just prior to the filing of the second action, Reese filed a grievance with the club's grievance committee against each of the appellees herein, alleging that they had distributed to the membership confidential material concerning Faint. After the second lawsuit was filed, the grievances were amended on October 1,

2

1990, to include a charge of conduct unbecoming a member. When the grievance committee was unable to amicably resolve the dispute, the committee referred the matter to the trustees.

**{¶ 6}** On January 21, 1991, the trustees met and recommended that the six individuals named in the grievance (the five appellees plus Sherrill Flood) be suspended from participation in membership meetings for three years and from holding any club office, participating on club committees, or representing the club in any way for five years. Pursuant to the constitution, a special membership meeting was called for February 11, 1991, to act on the trustees' recommendation.

**{¶ 7}** Before that meeting could be held, the appellees brought a third action in the trial court in February 1991. The club and Reese were named as defendants. In their complaint, appellees essentially alleged that the board had not complied with the club's constitution in recommending their suspensions from club activities. Appellees also asserted that the charges in the grievances did not state proper grounds for discipline against them. On August 26, 1991, the trial court granted appellants' motion to dismiss. The court held that the grievances did state proper grounds for disciplinary action by the board. The court further held that that the procedure followed by the board had been in compliance with the club's constitution. Finally, the court concluded that since the board's exercise of power had been fair and reasonable, it would not take jurisdiction over the matter until a final disposition had been made.

**{¶ 8}** Buoyed by the trial court's dismissal, the board held a special meeting on the following day. Following a discussion of the situation, the board voted to rescind its prior recommendation, and decided instead to recommend that appellees be expelled from the club. A special meeting of voting members was set for September 5, 1991, and notice of that meeting was sent to each appellee. In the notice, each appellee was advised that a final determination on the grievances would be made at the meeting. None of appellees attended the meeting, but they

did send a letter to each voting member requesting that they dismiss the grievances. However, the board's recommendation to expel each appellee was adopted by the voting members. The members decided not to expel Sherill Flood, whom the board also recommended be expelled.

{¶ 9} Appellees were not ready to give up the ship. They continued this now-titanic struggle with another wave of litigation. In March 1992, appellees initiated the present action against appellants. In this, their fourth complaint, appellees alleged that they had been denied the opportunity for a full hearing on the grievances. They further alleged that the board had failed to follow the required procedure when it changed its recommendation from suspension to expulsion. Appellees sought as relief reinstatement as Class B members and monetary damages for emotional anguish and loss of equity in the value of the club's assets.

{¶ 10} Appellants answered appellees' complaint and asserted three counterclaims against them. Appellants' claims were based upon allegations of malicious prosecution, abuse of process, and breach of contract.

{¶ 11} Both sets of parties filed motions for summary judgment. The trial court, in separate orders, granted summary judgment to appellants on the claims of appellees, and granted appellees summary judgment on all of appellants' counterclaims.

{¶ 12} Appellees appealed and appellants cross-appealed to the Lake County Court of Appeals. The appellate court found in favor of appellees, determining that the trial court had erred in granting summary judgment against them. The court found that appellants had failed to follow the procedure set forth in the club's constitution, and that appellees had been denied the opportunity to present a defense. Therefore, the court reasoned, the trial court had improperly awarded summary judgment.

{¶ 13} The appellate court affirmed the trial court's summary judgment against appellants. The court found that appellants' malicious prosecution claim

4

failed due to the lack of any seizure of appellant's property, their abuse of process claim failed due to the lack of demonstrating appellees' ulterior motive, and their contract claim failed because Ohio does not recognize an action for damages arising from the failure of a member of a nonprofit organization to abide by the decisions of the corporate officers.

**{¶ 14}** The cause is now before this court upon the allowance of a discretionary appeal.

_____

*McCarthy, Lebit, Crystal & Haiman Co., L.P.A., Jeffrey A Huth* and *Mark B. Cohn; Smith, Marshall & Weaver* and *Stephen C. Merriam,* for appellants.

*Albert L. Purola*, for appellees (Letitia Graham, substitute party)

_____

**PFEIFER, J.**

**{¶ 15}** We reverse the appellate court on its ruling regarding whether appellees were properly expelled from the club and on its ruling regarding appellants' abuse of process claim. We affirm the appellate court's decisions on appellants' malicious prosecution and contract actions.

I

Expulsion

**{¶ 16}** This is a case about a yacht club expelling some of its members. This is not the case of someone being denied his rights under the Constitution of the United States. We thus adopt a more relaxed standard as to whether appellees' due process rights were violated. We find that the appellants substantially complied with the club's constitution and that appellants should have been awarded summary judgment.

**{¶ 17}** Section 4, Article 2 of the club's constitution states that when the club's grievance committee is unable to amicably resolve a grievance, and it determines that discipline will be needed to resolve the problem, notice of the

charges must be given to the affected member by certified mail. No sooner than ten days after that notice "a formal closed hearing on the matter shall be conducted by the Board of Trustees." After the hearing, the board makes a recommendation which is voted upon by the voting members at a meeting. The club constitution does not stipulate how much time must pass between the trustees' recommendation and the meeting of the voting members, nor does it state whether persons to be disciplined may be heard at the meeting of the voting members.

{¶ 18} Pursuant to Section 5, Article 2 of the club constitution, the voting membership makes the final determination of whether to mete out discipline. The fact that the trustee's hearing was closed to appellees does not mean that they were denied an important right. The behavior for which the board recommended discipline was not subject to dispute: appellees could not deny that they had filed complaints against the club in the trial court.

{¶ 19} More importantly, the most significant opportunity to be heard was at the meeting of the voting membership. It was the voting membership who had the ultimate decision on appellees' fate. The trustees gave appellees at least seven days' notice of the meeting. Appellees took advantage of that time and communicated with the voting members through a letter. Appellees were not denied an opportunity to be heard at the members' meeting-- appellees simply chose not to attend. A discussion preceded the expulsion vote regarding each appellee. The members' meeting was not a mere rubber stamp of the trustees' recommendation. In fact, the board's recommendation regarding Flood was rejected by the members.

{¶ 20} Thus, the appellees had reasonable notice of the meeting at which the expulsion vote would be taken. They were able to communicate with the persons who would decide their fate. Appellees were not denied an opportunity to attend the meeting or to be heard at the meeting. In short, they knew the charges leveled against them and had a meaningful opportunity to do something about them.

**{¶ 21}** To substantially comply with the club's constitution, appellants had to provide appellees notice and an opportunity to be heard. Appellants did so in a fair and reasonable manner. Accordingly, we reverse the appellate court and find that the trial court properly granted summary judgment in favor of appellants on the expulsion issue.

II

Malicious Prosecution

**{¶ 22}** In *Crawford v. Euclid Natl. Bank* (1985), 19 Ohio St.3d 135, 19 OBR 341, 483 N.E.2d 1168, this court held that a plaintiff must satisfy four elements to establish a claim of malicious civil prosecution:

"[I]n order to state a cause of action for malicious prosecution in Ohio, four essential elements must be alleged by the plaintiff:(1) malicious institution of prior proceedings against the plaintiff by defendant, * * * (2) lack of probable cause for the filing of the prior lawsuit, * * * (3) termination of the prior proceedings in plaintiff's favor, * * * and (4) seizure of plaintiff's person or property during the course of the prior proceedings * * * ." *Crawford,* 19 Ohio St.3d at 139, 19 OBR at 344, 483 N.E.2d at 1171.

**{¶ 23}** In a later case, *Trussell v. General Motors Corp.* (1990), 53 Ohio St.3d 142, 559 N.E.2d 732, this court eliminated the element of arrest or seizure from the claim of malicious *criminal* prosecution. In *Trussell*, this court noted that a majority of states had eliminated the element of arrest or seizure from both criminal and civil malicious prosecution. However, this court did not overrule *Crawford* but instead pointed out the key differences in the two types of malicious prosecution claims. The court noted that a special stigma arises in criminal cases:

"The tort of malicious criminal prosecution compensates the plaintiff for the damage done to dignity and reputation caused by false accusation of a crime. * * * The damage occurs whether the plaintiff is arrested or * * * haled into court on a summons. Unlike the victim of malicious civil prosecution, the victim of false

criminal charges does not have the remedies provided by Civ.R. 11." Id. at 145-146, 559 N.E.2d at 736.

{¶ 24} The *Trussell* court noted that the seizure requirement was first instituted by this court in a malicious civil prosecution case in *Cincinnati Daily Tribune v. Bruck* (1900), 61 Ohio St. 489, 56 N.E. 198. The line of cases developing malicious criminal prosecution, culminating in *Rogers v. Barbera* (1960), 170 Ohio St. 241, 10 O.O.2d 248, 164 N.E.2d 162, did not include the seizure requirement. The distinction between civil and criminal cases had become blurred in *dicta* in *Kelly v. Whiting* (1985), 17 Ohio St.3d 91, 17 OBR 213, 477 N.E.2d 1123, but the *Trussell* court clarified the distinction between the two in the case law and in fact.

{¶ 25} We believe that the interests of justice and judicial economy are best served by continuing to require the element of seizure of property in malicious civil prosecution cases. The damages from being sued civilly are of a different character than from being arrested or haled into court on a criminal charge. A person's freedom is not at stake in a civil trial. Civ.R. 12 allows for the quick disposal of meritless claims, and Civ.R. 11 presents the best avenue to deal early, quickly, and effectively with bogus lawsuits. Also, R.C. 2323.51(B)(1) allows for the award of attorney fees to victims of frivolous conduct in a civil case.

{¶ 26} We echo this court's concern in *Crawford* that removing the seizure requirement from malicious civil prosecution claims would result in an explosion of claims for malicious prosecution. There are opportunities already built into the civil system to deal with a meritless lawsuit within that same lawsuit, rather than instituting another suit. Every successful summary judgment defendant should not be tempted to file a malicious prosecution claim.

{¶ 27} We therefore retain in malicious civil prosecution cases the long-held and well-reasoned requirement of seizure of property, and leave to our Rules of Civil Procedure, or the General Assembly, the method with which to deal with

meritless civil claims. A cause of action for malicious civil prosecution will lie only in cases where there is a prejudgment seizure of property, *i.e.*, where there essentially has been a judgment against, and a concomitant injury suffered by, a defendant before he has had a chance to defend himself. We therefore decline to overrule this court's decision in *Crawford.*

{¶ 28} Thus, in order to properly assert a claim of malicious civil prosecution, appellants were required to satisfy the seizure element. Since appellants presented no evidence of seizure, we affirm the judgment of the appellate court on this issue.

III

Abuse of Process

{¶ 29} In order to establish a claim of abuse of process, a plaintiff must satisfy three elements: "(1) that a legal proceeding has been set in motion in proper form and with probable cause;(2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp, Schaffer & Rowe Co., L.P.A* (1994), 68 Ohio St.3d 294, 298, 626 N.E.2d 115, 118.

{¶ 30} Appellants argue that appellees' barrage of lawsuits constituted an abuse of process, and specifically that the third and fourth actions were initiated to stop the voting members from acting on the board's disciplinary recommendations. The appellate court found that appellants could not prove their case as to the element of appellees' ulterior motive. We disagree, and believe a genuine issue of material fact exists as to whether appellees had an ulterior motive for filing their lawsuits.

{¶ 31} "'[A]buse of process' differs from 'malicious prosecution' in that the former connotes the use of process properly initiated for improper purposes, while the latter relates to the malicious initiation of a lawsuit which one has no reasonable chance of winning." *Clermont Environmental Reclamation Co. v. Hancock* (1984),

9

16 Ohio App.3d 9, 11, 16 OBR 9, 12, 474 N.E.2d 357, 362. In an abuse of process case, "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." Prosser & Keeton on Torts, (5 Ed. 1984), 898, Section 121. Simply, abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order.

{¶ 32} We believe that reasonable minds could conclude that appellees instituted at least one of their suits with the intention to use it as a club to coerce the membership to vote in their favor. Clearly, the trial court had no authority to order club members how to vote. In opposition to appellees' motion for summary judgment on the issue, appellants presented evidence which could be construed as proof of an ulterior motive. In their September 3, 1991 letter to the members, appellees stated, in part:

"Without the Grievances, there would not have been a law suit * * * . *Remember, no grievances, the case is dead and you members stop paying * * *.* VOTE TO DROP THE GRIEVANCES." (Emphasis *sic*.)

{¶ 33} Appellee Graham also stated in a deposition that "the reasoning behind our litigation was, to keep the membership from, in fact, rejecting our membership."

{¶ 34} There are sufficient facts in their favor for appellants to successfully prosecute a claim for abuse of process. Accordingly, we overrule the court of appeals on this issue.

IV

Contract Action

{¶ 35} Finally, appellants appeal the holding of the appellate court that a nonprofit corporation cannot maintain an action for damages incurred as a result of a member's failure to abide by the rules and regulations of the corporation. The

appellants' remedy lies within the contract between the club and its members. The club exercised its right of expulsion thereunder. We decline to recognize any action for damages for appellees' alleged breach, and therefore affirm the appellate court on this issue.

*Judgment affirmed in part,*
*reversed in part, and cause remanded.*

MOYER, C.J., WRIGHT and COOK, JJ., concur.

RESNICK, J., concurs in part and dissents in part.

DOUGLAS and F.E. SWEENEY, JJ., dissent.

_____

**ALICE ROBIE RESNICK, J., concurring in part and dissenting in part.**

{¶ 36} I agree in substance with the majority's statement that "[t]o substantially comply with the club's constitution, appellants had to provide appellees notice and an opportunity to be heard." However, as the court of appeals correctly points out, "Article 2, Section 4 of the club's constitution states that if the grievance committee cannot resolve the dispute raised in a grievance, notice of the charges must be forwarded to the member by certified mail. Section 4 then expressly states that a formal closed 'hearing' must be conducted by the board of trustees, which must afterwards make a recommendation as to whether disciplinary action is warranted.

{¶ 37} "As appellants [Frank Robb *et al.*] aptly note, the trial court's entire analysis as to whether they had received due process was predicated upon the determination that the special meeting of the voting members constituted a 'hearing.' However, the plain wording of the club's constitution indicates that the 'hearing' on a grievance is to be held before the board, not the voting members."

{¶ 38} Clearly, pursuant to this constitution, the grievant must be afforded the opportunity to be heard and to present a defense at the board

11

meeting. Appellees were not afforded this opportunity. While I strongly believe that resolution of disagreements within a private club should be resolved within that club, the club does not have carte blanché to proceed however it pleases. Due process must still be provided a member. The process that is due a grievant member in such circumstances is that which is set forth in the club's regulations, constitution and by-laws.

{¶ 39} The majority mistakenly determines that the club "substantially" complied with the club's constitution when in actuality there was not even a semblance of compliance. I agree with the court of appeals that the "board of trustees acted beyond their power" by not holding a proper hearing. Due to their failure to comply with Section 4, Article 2 of the club constitution regarding notice and hearing, appellants should not be entitled to judgment as a matter of law. I would affirm the judgment of the court of appeals in its entirety.

_____

**DOUGLAS, J., dissenting.**

{¶ 40} I must respectfully dissent. Once again, a majority of this court misses the opportunity to bring the law of Ohio into at least the twentieth century. By continuing the archaic requirement, in cases of malicious civil prosecution in Ohio, that a plaintiff must show that his or her person or property was seized during the underlying proceedings, the majority grants absolute immunity from suit to a litigant who has initiated a prior law suit with actual malice and without any probable cause. Seldom, if ever, will a party's person or property be seized in a civil suit.

{¶ 41} Unfortunately, spurious suits against "deep-pocket" or "target" defendants have become a significant problem. By today's majority decision, target defendants such as judges, doctors, newspapers and public officials are left without a remedy even though the suits brought against them have no basis in law or fact. Simply put, this is unfair and wrong.

**{¶ 42}** It is further interesting to note that the majority does not even cite, never mind discuss, *Border City S. & L. Assn. v. Moan* (1984), 15 Ohio St.3d 65, 15 OBR 159, 472 N.E.2d 350. Therein, seizure of a person or property was not a requirement that had to be met before a suit such as the one now before us would lie. With regard to this entire question, I respectfully refer any interested reader to the dissenting opinions of then Chief Justice Celebrezze and myself in *Crawford v. Euclid Natl. Bank* (1985), 19 Ohio St.3d 135, 19 OBR 341, 483 N.E.2d 1168.

**{¶ 43}** I dissent.

F.E. SWEENEY, J., concurs in the foregoing dissening opinion.

_____