**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0199n.06

No. 10-3894

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Feb 21, 2012*

LEONARD GREEN, Clerk

MEL AARON TAYLOR,
JAMES STEVEN BONNELL,

     Plaintiffs-Appellants,

v.

CHIEF THOMAS STREICHER, et al.,

     Defendants-Appellees.

                          /

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO**

---

**BEFORE:**    **MERRITT, BOGGS, and CLAY, Circuit Judges.**

     **CLAY, Circuit Judge.** Plaintiffs Mel Aaron Taylor and James Steven Bonnell appeal from an order of the United States District Court for the Southern District of Ohio granting summary judgment to Defendants Chief Thomas Streicher, Lieutenant Colonel James Smith, Lieutenant Colonel Richard Biehl, Captain David Ratliff, Specialist William O'Brien, Sergeant Lisa Thomas, and the City of Cincinnati on Plaintiffs' federal claims under 42 U.S.C. §§ 1983 and 1985, and Ohio common law claims for malicious prosecution, abuse of process, defamation, false imprisonment, and intentional infliction of emotional distress. For the reasons set forth below, we **AFFIRM** the district court's order.

## BACKGROUND

### 1. SCOPE and Computer Skills Initiative Program

Plaintiff Taylor was an African-American officer of the Cincinnati Police Division. He was ordered by his superiors, Captain David Ratliff and Lieutenant Colonel James Smith, to develop "youth diversionary programs" for the police department and to request funds from the State of Ohio to operate the programs. In 1998, Taylor developed the Scouting and Community Oriented Policing Efforts (SCOPE) program and received state funding for it. The program was aimed at keeping youth off of the streets. He hired Plaintiff Bonnell, a local teacher, to compile data using surveys and questionnaires in order to track the performance of the children in the program and to measure the program's overall success. SCOPE expanded to include a Computer Skills Initiative Program to teach inner-city children computer skills on donated computers. The program purported to provide the students with computers at the end of the program. Apparently, the police department was largely unaware of the program or its use of funds, which, according to Taylor, was due to the fact that he had little guidance and was not given instructions as to policies or procedures.

When preparing the state grant renewal application in SCOPE's second year, Taylor discovered that the funds for the coming year would not cover the cost of the computers for the Computer Skills Initiative Program. Taylor spoke with an attorney, Marshall Hunt, and the two formulated a plan to obtain donated computers. Taylor owned a building and leased its space to the police department for use as a police substation office, known as the Roselawn Neighborhood

Substation.[1]   Hunt incorporated Taylor's substation into a non-profit organization, called the Roselawn Neighborhood Substation Support Group.   Taylor, Bonnell, and Hunt were the three named board members of the organization.   Using the non-profit status of the Roselawn Neighborhood Substation Support Group, Plaintiffs were able to acquire donated computers, which they stored at a local elementary school.

## 2.    Suspicion of Wrongdoing by Taylor

In 2000, Taylor was caught paying his personal cellular phone bill using the checking account for the Roselawn Neighborhood Substation Support Group.  Taylor's supervisor, Lieutenant Colonel Richard Janke discovered Taylor's use of the non-profit's checking account and became concerned that Taylor was improperly commingling his personal funds with those of the Roselawn Neighborhood Substation Support Group.   Janke directed the police internal investigations department to look into the matter.  During the course of the investigation, the department discovered that the SCOPE grant request submitted to the state by Taylor promised to implement certain activities that were never developed.  Several officers, including Specialist William O'Brien, were tasked with interviewing police officers at the police station regarding their knowledge of Taylor's conduct and the SCOPE and Computer Skills Initiative programs.

## 3.    Bonnell's Meeting with O'Brien

Bonnell was interviewed about Taylor's conduct and involvement in SCOPE.  Bonnell vouched for Taylor during the investigation, indicating that Taylor had not taken wrongful action.

---

[1]Substations are off-site offices where police officers can do work without traveling to the police district's headquarters.

Bonnell later heard a rumor from Taylor that several officers had created a "rap sheet" that alleged that Bonnell was a convicted child molester with an outstanding warrant for his arrest. Bonnell believed that some officers showed the rap sheet to the officers who were interviewed during Taylor's investigation, in order to prejudice the interviewed officers against Bonnell. Plaintiffs believe that the police department wanted to get rid of Taylor, so the motive of alienating officers from Bonnell was to dissuade them from joining Bonnell in support of Taylor.

Bonnell called Specialist O'Brien and asked to meet during Bonnell's lunch hour at an Old Country Buffet restaurant near Bonnell's office. Bonnell wanted to discuss the existence of the alleged rap sheet and prevent its further dissemination. Two other officers accompanied O'Brien to the parking lot to meet with Bonnell. At the outset of the meeting, Bonnell told O'Brien about the existence of the rap sheet and asked him to put an end to its circulation. O'Brien asked Bonnell about the rap sheet, then asked him to disclose who had the rap sheet or who knew about the rap sheet. Bonnell allegedly became worried about getting officers in trouble—even though they were causing him harm—and would not disclose the officers' names to O'Brien. O'Brien informed Bonnell that, for Bonnell's own protection, he must stay and give the names of the officers alleged to be harassing him. O'Brien also stated that it was in Bonnell's best interest to cooperate, that he could be charged with obstruction of official business if he did not disclose the names of those harassing him, that he would likely be a state witness, and that Bonnell would be protected by the local prosecutor. At Bonnell's request, O'Brien called the local prosecutor on his cellular phone so that Bonnell could speak with the prosecutor to discuss whether he should disclose the names of the officers. At the suggestion of the prosecutor, Bonnell eventually disclosed to O'Brien that Taylor

told him about the rap sheet but that he did not know which officers had made, possessed, or seen it. He did not reveal any other names. The meeting lasted approximately forty-five minutes.

### 4. Search Warrants and Charges

Search warrants were executed on Taylor's work computer and office, at the elementary school where the computers were stored, on his bank account, on the Roselawn Neighborhood Substation bank account (which was part of the Cincinnati Police Federal Credit Union Account), at the Roselawn Neighborhood Substation building, and at another building where Taylor worked. Sergeant Lisa Thomas provided an affidavit in support of the search warrants. Taylor was informed of the existence of some of the search warrants by Lieutenant Colonel Richard Biehl.

Thomas Streicher, Chief of the Cincinnati Police Division, referred the findings of the investigation and the allegations of wrongdoing to the Hamilton County Prosecutor's Office. The local prosecutor decided to charge Taylor with a ten-count felony indictment, including the crime of having an unlawful interest in a public contract. A news article subsequently appeared, headlined "Cop Indicted on Theft Charges."

Prior to his jury trial, Taylor struck a deal with the prosecutor: the charges against Taylor would be dropped if he resigned or retired from the police force and if the non-profit organization, the Roselawn Neighborhood Substation Support Group, pleaded guilty to two felony counts of tampering with records and admitted to the truth of the allegations supporting the charges. Taylor agreed to the deal.

**5.       Other Allegations: Gang Unit**

Plaintiffs also assert that other facts not related to the SCOPE and Computer Skills Initiative programs are relevant to support several of Taylor's claims that his rights were violated due to his work in the police department's "gang unit." Taylor alleges that he worked in the gang unit and had spoken publicly about the gang problem in Cincinnati. According to Taylor, the police department did not want the public to fear the downtown area or to stop supporting downtown businesses, so the department required that Taylor stop speaking publicly about Cincinnati's gangs. Taylor also alleges that, at a meeting regarding the suggested expansion of the gang unit, Lieutenant Colonel Janke spoke against the expansion and told a gang unit officer to get his "shit" off of the podium when it was Janke's turn to speak. Taylor describes these events as examples of the police department's animosity toward him for his gang-related work.

**6.       Plaintiffs' Lawsuit**

Taylor and Bonnell jointly filed a complaint in federal court against Defendants Chief Streicher, Lieutenant Colonel Smith, Lieutenant Colonel Biehl, Captain Ratcliff, Specialist O'Brien, Sergeant Thomas, and the City of Cincinnati for violations of Taylor's Fourth and Fourteenth Amendment rights against unreasonable searches and seizures (42 U.S.C. §§ 1983 and 2000e claims) and for forming a conspiracy to violate their equal-protection rights (42 U.S.C. § 1985 claim). Plaintiffs also raised Ohio common law claims of malicious prosecution, abuse of process, defamation, false imprisonment, and intentional infliction of emotional distress. Defendants' motion to dismiss the § 2000e claim was granted, and Plaintiffs did not appeal that order. After discovery, Defendants moved for summary judgment on all claims, alleging qualified and municipal immunity

and arguing that, even absent immunity, they were entitled to judgment as a matter of law. The district court found that Plaintiffs had not presented sufficient evidence to support their claims and granted summary judgment to all Defendants on all remaining claims. Plaintiffs timely appealed.

## DISCUSSION

We review a grant of summary judgment *de novo*. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011). We view the facts and reasonable inferences in the light most favorable to the nonmoving party. *Holloway*, 220 F.3d at 772.

On appeal, Plaintiffs argue that there are genuine issues of material fact for each claim, but they fail to state which facts are disputed or where in the record we may find a dispute. When a party argues that summary judgment was not appropriate because the parties dispute a material fact, that party "must support the assertion by . . . citing to particular parts of materials in the record, . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1) (2011).

We express our surprise that most, if not all, of Plaintiffs' claims were not initially dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Regardless, in reviewing the claims, we find that they are either waived on appeal or insufficiently supported to survive Defendants' motion for summary judgment. We decline to address Plaintiffs' contention that the district court erred in granting qualified immunity to

Defendants and in failing to permit municipal liability, because the district court did not base its decision on those issues.

## A. Taylor's Claims

### 1. 42 U.S.C. § 1983

The Complaint raised a § 1983 claim against Defendants for an unreasonable search and seizure of Taylor, in violation of the Fourth and Fourteenth Amendments. We assume that this argument is based on the search of his offices, computer, and bank accounts, though Plaintiffs have not stated as much. The district court dismissed the § 1983 claim for failure to provide factual support for the claim and, alternatively, because *Heck v. Humphrey*, 512 U.S. 477 (1994), barred the court from collaterally attacking a state conviction. In their appellate brief, Plaintiffs do not appear to appeal the dismissal of Taylor's § 1983 claim, because they do not mention the claim at all. Instead, they only mention the statute in regard to jurisdiction, and they only give a vague statement that the case is about their "civil rights claim" or "civil rights action" in their statement of jurisdiction and issues presented on review. We hold that Taylor failed to properly raise this issue on appeal and therefore waived it. *See United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999) (noting the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (internal quotation marks and citation omitted)).

## 2.    42 U.S.C. § 1985(2) Equal Protection[2]

Taylor next argues that his equal-protection rights have been violated by Defendants, in violation of 42 U.S.C. § 1985(2).  Specifically, Taylor argues that Defendants conspired (1) to engage in a pattern and practice of disciplining black officers more harshly than white officers and treating Taylor different from similarly situated white officers, and (2) to treat Taylor, an officer of the "gang unit," different from non-gang unit officers.

Section 1985(2) of Title 42 of the United States Code provides a right to damages where:

> two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

42 U.S.C. § 1985(2).  The elements of a § 1985 claim are thus: "(1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws and (3) an act in furtherance of that conspiracy (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen." *White v. Trapp*, 93 F. App'x 23, 26 (6th Cir. 2004) (quoting *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir.

---

[2]The Complaint appears to raise a § 1985(2) claim on behalf of both Taylor and Bonnell. However, the district court construed the claim as only on behalf of Taylor, and Plaintiffs do not appeal that issue.  We therefore hold Bonnell's § 1985(2) claim, to the extent that it existed, to be waived on appeal.

We also note that Plaintiffs' Complaint originally raised a § 1985(2) conspiracy claim for a violation of Plaintiffs' "civil rights," without mentioning an equal-protection violation.  As they did during the summary judgment stage, on appeal Plaintiffs fail to mention § 1985(2) and only argue that Defendants violated their "equal protection rights" by engaging in a pattern and practice of disciplining black officers more harshly than white officers.  Although Defendants address the § 1985(2) and equal-protection claims separately, we construe them as the same claim.

1996)) (internal quotation marks omitted). "The plaintiff must also allege that the conspiracy was motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Id.* (quoting *Bartell v. Lohiser*, 215 F.3d 550, 559–60 (6th Cir. 2000)); *see Kush v. Rutledge*, 460 U.S. 719, 726 (1983).

Taylor appears to raise two bases on which his equal-protection rights were violated: his race and his "work on gang investigations." Defendants concede that Taylor is a member of the protected class of African-Americans. However, Taylor's involvement in the gang unit does not place him in a protected class. We will therefore only consider Taylor's race-based § 1985(2) claim.

Taylor's race-based § 1985(2) claim asserts that Defendants conspired to deny him his equal-protection rights by engaging in a pattern and practice of disciplining African-American officers more harshly than non-minority officers and that Taylor suffered adverse employment action when he ultimately resigned. Taylor simply has not offered any evidence of a conspiracy among Defendants. He has also not shown that his resignation constitutes an adverse employment action; his resignation was the result of the plea deal with the Hamilton County prosecutor's office—not Defendants—wherein his non-profit corporation pled guilty to felony charges and the charges against him were dismissed. Moreover, Taylor has offered no evidence linking his resignation to his race. Although Plaintiffs make sweeping assertions that African-American officers are disciplined more than non-minority officers, they present no evidence to support this claim. There is simply nothing in the record to support Taylor's claim of race-based denial of equal protection. We hold that the district court properly granted summary judgment to Defendants.

### 3. Malicious Prosecution

Taylor next raises a malicious-prosecution claim, though it is unclear whether the claim is brought under state or federal law. *See Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007) (analyzing a malicious-prosecution claim under both state and federal law where the court was uncertain under which law the claim was brought).

> In order to state a cause of action for malicious prosecution in Ohio, four essential elements must be alleged by the plaintiff: (1) malicious institution of prior proceedings against the plaintiff by defendant, (2) lack of probable cause for the filing of the prior lawsuit, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings.

*Robb v. Chagrin Lagoons Yacht Club, Inc.*, 662 N.E.2d 9, 13 (Ohio 1996) (internal ellipses omitted). Although the elements of a federal claim for malicious prosecution remain uncertain, "[w]hat is certain, however, is that such a claim fails when there was probable cause to prosecute, or when the defendant did not make, influence, or participate in the decision to prosecute." *Fox*, 489 F.3d at 237.

Taylor fails to adequately allege, let alone demonstrate through evidence, that Defendants "instituted" the criminal proceedings against Taylor in the sense that they made, influenced, or participated in the decision to prosecute. The decision to prosecute was made by the Hamilton County prosecutor and not Defendants. Even if Police Lieutenant Colonel Janke, the instigator of the original police investigation against Taylor, were to be considered a participant in the decision to prosecute, he is not a named defendant. Officers "cannot be held liable for malicious prosecution when they did not make the decision to prosecute the plaintiff." *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005) (quoting *Skousen v. Brighton High Sch.*, 305 F.3d 520 (6th Cir. 2002))

(internal citation marks and alterations omitted). Summary judgment to Defendants was proper on this claim.

### 4. Abuse of Process

Taylor brings an abuse-of-process claim as an alternative theory to his malicious-prosecution claim. Under Ohio law,

> to establish a claim of abuse of process, a plaintiff must satisfy three elements: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process.

*Robb*, 662 N.E.2d at 14 (quoting *Yaklevich v. Kemp, Schaeffer & Rowe Co., LPA*, 626 N.E.2d 115, 188 (Ohio 1994)) (internal citations omitted); *Preferred Props. v. Indian River Estates*, 276 F.3d 790, 801 (6th Cir. 2002). "Simply, abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order." *Robb*, 662 N.E.2d at 14.

Plaintiffs' Complaint states that Taylor's arrest and indictment, as well as the prosecution's refusal to dismiss the charges against him, were an abuse of process. Taylor argues that these actions were made with the "ulterior motive of removing Plaintiff Taylor from his employment with the Cincinnati Police Department." However, Taylor appears to abandon that argument on appeal, as his response to the motion for summary judgment and appellate brief both allege that the ulterior motive was to "silence Lieutenant Taylor regarding gang investigations and the gang presence in the City of Cincinnati." Taylor alleges that Defendants were successful, in that Taylor resigned and "constitutional violations . . . were done to [him]."

12

As to the arrest, Plaintiffs admit in their Complaint that Defendants had probable cause to arrest Taylor. Taylor nevertheless argues that the arrest was still an abuse of process because the arrest was made with an ulterior motive. Taylor has not demonstrated with any evidence that Defendants were actually acting under the alleged ulterior motive of silencing Taylor regarding gang activity in the city. *See Schiff v. Dickson*, No. 96539, 2011 WL 5870048, at *3–4 (Ohio Ct. App. Nov. 23, 2011) (denying an abuse-of-process claim where there was no evidence of an attempt to accomplish an ulterior motive). Taylor's evidence in support of this contention is limited to allegations that Taylor was part of the "gang unit," that he was silenced regarding the prevalence of gang activity, that Lieutenant Colonel Janke did not want to expand the gang unit, and that Janke was discourteous to the gang unit. This evidence is simply insufficient to demonstrate that the named Defendants arrested Taylor to silence him about the prevalence of gangs in Cincinnati, rather than as a response to the charges filed against him. There was no abuse of process in arresting Taylor.

As to the indictment and the refusal to dismiss the charges against Taylor, those actions are attributable to the local prosecutor and not Defendants. The prosecutor has the power to charge and refuse to dismiss charges, and a court would have the power to adjudicate those charges, had they not been dismissed in the plea deal. *See Toldeo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 437 F. App'x 381, 385–86 (6th Cir. 2011). Also, Taylor has not refuted Defendants' contention that the motive for the prosecution was that he had an unlawful interest in a public contract, among other things. Thus, even taking Taylor's allegations as true, there is no abuse of process in the indictment or the refusal to dismiss the charges. The district court properly granted summary judgment to Defendants.

### 5.    Defamation[3]

Taylor next alleges that Defendants defamed him through libel and slander.

> Under Ohio law, the elements of a defamation claim, whether libel or slander, are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."

*Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 611 N.E.2d 955, 962 (Ohio Ct. App. 1992)).

First, Taylor argues that he was defamed because the grand jury indictment contained false statements. Taylor does not tell us which statements are false, explain why the statements are false, or produce any evidence to show that the statements are false. Moreover, the named Defendants are not responsible for the allegations in the indictment—only the prosecutor is responsible. Taylor's defamation claim on this basis is completely unsupported.

Second, to the extent that Taylor argues that the grand jury testimony of Defendants was defamatory, grand jury testimony is protected by absolute privilege. *See Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1985) (citing *Briscoe v. LaHue*, 460 U.S. 325 (1983) (analyzing a claim under 42 U.S.C. § 1983 for perjured testimony and holding that witnesses in judicial proceedings, generally, are protected by absolute immunity)); *see also Rehberg v. Paulk*, 611 F.3d 828, 841 (11th Cir. 2010),

---

[3]In their appellate brief, Plaintiffs' argument heading lists the "defamation claims asserted by the Lieutenant M. Aaron Taylor and James Steven Bonnell," and Plaintiffs insist that "[e]ach Plaintiff" has sufficiently proven defamation. However, Plaintiffs make no effort on appeal to argue Bonnell's defamation claim, nor do they state why the district court erred in granting summary judgment to Defendants. We therefore hold that Bonnell waived his defamation claim on appeal. *See Reed*, 167 F.3d at 993.

*cert. granted*, 131 S. Ct. 1678 (2011), ("a witness has absolute immunity from civil liability based on his grand jury testimony" (internal citation and quotation marks omitted)); *Anthony v. Baker*, 955 F.2d 1395, 1400–01 (10th Cir. 1992) (grand jury lay-witness testimony is protected by absolute immunity, though grand jury complaining-witness testimony is not); *M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 210 (Ohio 1994) ("The absolute privilege or 'immunity' for statements made in a judicial proceeding extends to every step in the proceeding, from beginning to end."). Thus, Taylor has failed to state a claim on that basis.

Finally, Taylor alleges that the Defendants defamed him because a news article, entitled "Cop Indicted on Theft Charges," was published after his indictment. Taylor does not allege that Defendants made any statements to the article's author or publisher; rather, he merely argues that, without the baseless indictment, the article would not have contained the allegedly false and malicious information in the indictment. This argument is frivolous. Defendants are not responsible for the publication of the allegedly defamatory statements in the news article; only the news article publisher, who is not a named defendant, is responsible for the publication. Furthermore, Plaintiffs have not alleged which statements, if any, within the article are false or defamatory. Indeed, the fact that Taylor was "indicted on theft charges" was true. The district court properly granted summary judgment to Defendants on this claim.

### 6.   Intentional Infliction of Emotional Distress[4]

Under Ohio law, the elements for a claim of intentional infliction of emotional distress are:

> (1) the defendant intended to cause emotional distress, or knew or should have known his actions would result in serious emotional distress, (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency, and can be considered completely intolerable in a civilized community, (3) the defendant's actions proximately caused psychic injury to the plaintiff, and (4) the plaintiff suffered serious mental anguish of the nature no reasonable man could be expected to endure.

*Rigby v. Fallsway Equip. Co.*, 779 N.E.2d 1056, 1064 (Ohio Ct. App. 2002) (quoting *Jones v. White*, No. 18109, 1997 WL 669737, at *8 (Ohio Ct. App. Dec. 2, 1997)). "Liability has been found only where the conduct . . . [is] to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007). Furthermore, the emotional distress suffered by the victim must be severe and debilitating. *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983). Under Ohio law, "plaintiffs claiming severe and debilitating emotional injury must present some guarantee of genuineness in support of their claim, such as expert evidence, to prevent a court from granting summary judgment in favor of the defendant." *Knief v. Minnich*, 658 N.E.2d 1072, 1075 (Ohio Ct. App. 1995); *see Jacob v. Fadel*, No. 530236, 2006 WL 2790399, at *4 (Ohio Ct.

---

[4]In the motion for summary judgment and subsequent responses, the appellate briefs of both parties, and the district court opinion, Plaintiffs' claim of intentional infliction of emotion distress is addressed for both Taylor and Bonnell. However, a close reading of Plaintiff's Second Amended Complaint reveals that Plaintiffs never made a claim of intentional infliction of emotional distress for Bonnell. Plaintiffs cannot amend their Complaint through briefing. Because Plaintiffs never alleged this claim for Bonnell, they cannot argue that it was error for the district court to reject that claim (even if the court rejected it based on the merits rather than a failure to plead).

App. Sept. 26, 2006) (an affidavit of the victim alleging his or her own severe emotional distress is not sufficient to sustain their burden under a motion for summary judgment); *Motley v. Flowers & Versagi Ct. Reps., Inc.*, No. 72069, 1997 WL 767466, at *4 (Ohio Ct. App. Dec. 11, 1997) (same).

In support of this claim, Taylor alleges only that his actions in running the SCOPE and Computer Skills Initiative programs were "subjected to the scrutiny of the Planning Department of the Cincinnati Police Division" and that a news article headlined "Cop Indicted on Theft Charges" was published and caused him psychological damage.

Taylor's allegations fall far short of proving that Defendants intentionally inflicted emotional distress. First, it is not "outrageous" that a program sponsored by the police department would be subject to review by the police department. Second, as discussed *supra*, the news article was not written or published by the named Defendants, nor did it contain quotes from them, so any harm caused by the article's publication or headline is not attributable to Defendants. Third, although Taylor states that he has suffered "severe" mental anguish, he has not produced or even alleged any facts to support this claim. *See Jacob*, 2006 WL 2790399, at *4. Because Taylor has not met his burden of demonstrating facts to support his intentional-infliction-of-emotional-distress claim, the district court properly granted summary judgment to Defendants.

17

**B.  Bonnell's False-Imprisonment Claim[5]**

Bonnell argues that he was falsely imprisoned by Defendant O'Brien.  A claim of false imprisonment "requires proof that one was intentionally confined within a limited area, for any appreciable time, against his will and without lawful justification." *Evans v. Smith*, 646 N.E.2d 217, 224 (Ohio Ct. App. 1994).  "There is no confinement when a person voluntarily appears at a premise[s] and is free to leave." *King v. Aultman Health Found.*, No. 2009-CA-00116, 2009 WL 4309331, at *5 (Ohio Ct. App. Nov. 30, 2009).  Importantly, under Ohio law, "[m]ere submission to verbal direction in the absence of force or threat of force does not constitute confinement or detention." *Id.*; *Branan v. Mac Tools*, No. 03AP-1096, 2004 WL 2361568, at *8 (Ohio Ct. App. Oct. 21, 2004); *Condo v. B&R Tire Co.*, No. 95-CA-166, 1996 Ohio App. LEXIS 2257, at *3–4 (Ohio Ct. App. May 29, 1996); *Kinney v. Ohio Dep't of Admin. Servs.*, No. 88AP-27, 1988 Ohio App. LEXIS 3625, at *5 (Ohio Ct. App. Aug. 30, 1988).  "[T]he justification for detention, with respect to the torts of false arrest and false imprisonment, is to be measured primarily by two considerations: (1) whether the defendant was a person clothed in law with the authority to undertake a detention, and (2) whether the detention was accomplished pursuant to accepted legal procedures." *McFinley v. Bethesda Oak Hosp.*, 607 N.E.2d 936, 941 (Ohio Ct. App. 1992) (per curiam).

Bonnell alleges that he was falsely imprisoned in the Old Country Buffet parking lot by Defendant O'Brien and other, non-defendant officers.  To survive Defendant's motion for summary

---

[5]Plaintiffs' Complaint states only a claim of "false imprisonment" for Bonnell.  During the motion for summary judgment stage and in their appellate brief, Plaintiffs allege two claims: "unlawful detention, seizure, and false imprisonment" and "false imprisonment" of Bonnell.  It is unclear how the two false-imprisonment claims are different, so we analyze them together here.

judgment, Bonnell must raise facts to show that he was "confined," that it was "against his will," and that there was no "lawful justification" for the confinement. *See Evans*, 646 N.E.2d at 224.

First, Bonnell has not raised sufficient facts showing that he was confined. The meeting was made at Bonnell's request, during his lunch hour, in an outdoor parking lot, at a public restaurant, all of which were chosen by Bonnell. He was not placed in handcuffs nor was he required to remain by force or threat of force. The officers did not take any physical action to confine him. Although we take as true that O'Brien told Bonnell that he could not leave until he released the names of the alleged wrongdoers, words alone are insufficient to establish confinement. *See King*, 2009 WL 4309331, at *5. Therefore, we find that Bonnell has not shown the element of "confinement."

Second, we find that Plaintiffs have similarly not raised any facts to show that Bonnell's alleged confinement was against his will. Most importantly, Plaintiffs have not even alleged that the confinement was against Bonnell's will or that Bonnell wanted to leave. Plaintiffs merely state that the confinement was without Bonnell's "consent." A lack of affirmative consent to confinement is not necessarily the equivalent of confinement that is against one's will. More importantly, all of Plaintiffs' facts, taken as true, indicate that Bonnell not only consented to the meeting but arranged and controlled it. Bonnell requested the meeting himself and even picked the time and location that was most convenient to him. Bonnell asked Defendant O'Brien to prevent further dissemination of the alleged rap sheet. And O'Brien assisted Bonnell in determining whether Bonnell should continue the meeting and release the names of the wrongdoers, because O'Brien gave Bonnell his cellular phone to call the local prosecutor during the meeting and after O'Brien said he could not leave. Plaintiffs have simply not proven that any confinement was against Bonnell's will.

19

Finally, we consider whether Plaintiffs have presented sufficient facts to show that the alleged confinement was without "lawful justification." We find that Bonnell approached O'Brien in order to give him evidence of a crime, i.e., the intimidation of police officers by police officers. O'Brien responded to Bonnell's call for assistance in an appropriate manner—by asking him questions. O'Brien thus had lawful justification in questioning Bonnell and did not exceed the scope of his authority.

Because Plaintiffs fail to allege the facts necessary to survive a motion to dismiss Bonnell's false imprisonment claim, Defendants were properly granted summary judgment on this issue.

## CONCLUSION

For the reasons stated above, the judgment of the district court granting summary judgment to Defendants on all claims is **AFFIRMED**.