[Cite as *Weiler v. C.L.*, 2022-Ohio-4212.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

SHAWN WEILER,                           :

    Plaintiff-Appellant,        :

                                   No. 111657

    v.                          :

C.L.,[1]                                 :

    Defendant-Appellee.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 23, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-948429

---

### *Appearances:*

Shawn Weiler, *pro se*.

Timothy G. Sweeney, *for appellee*.

EILEEN T. GALLAGHER, J.:

{¶ 1} This cause came to be heard on the accelerated calendar pursuant to App.R. 11.1 and Loc.R. 11.1. Plaintiff-appellant, Shawn Weiler ("Weiler"), pro se, appeals the dismissal of his complaint and claims the following errors:

---

[1] In accordance with this court's policy and with 18 U.S.C. 2265(d)(3), initials are used herein to protect the privacy of the protected party.

1. The common pleas court erred in granting the defendant-appellee's motion to dismiss with regards to plaintiff-appellant's claim of malicious civil prosecution.

2. The common pleas court erred in granting the defendant-appellee's motion to dismiss with regards to plaintiff-appellant's claim of malicious criminal prosecution.

3. The common pleas court erred in granting defendant-appellee's motion to dismiss with regards to plaintiff-appellant's claim of constructive fraud.

{¶ 2} We find that Weiler's complaint failed to state a claim on which relief could be granted and affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} In June 2021, Weiler filed a complaint, asserting claims of malicious civil and criminal prosecution against defendant-appellee, C.L. Weiler twice amended the complaint, and the second amended complaint ("the complaint") sets forth three claims: malicious civil prosecution, malicious criminal prosecution, and constructive fraud.

{¶ 4} The complaint alleges that Weiler and C.L. were coworkers at Westlake Reed Leskosky ("WRL") from May 2016 through April 2017, when Weiler's employment at WRL was terminated. During that time, Weiler came to believe that C.L. was sexually interested in him. According to the complaint, C.L. "purposefully — but nonverbally — offered herself to [Weiler] to have sexual relations with [sic] at WRL during work hours." (Second amended complaint, ¶ 8.)

{¶ 5} WRL terminated Weiler's employment in April 2017. (Second amended complaint, ¶ 13.) The complaint does not specify the reason for Weiler's

termination.  However, in an email addressed to "WRL employees," attached to the complaint as exhibit No. 1, Weiler provided the following explanation of the events from his perspective:

> I was fired because of a *MALICIOUS LIE* in the form of a *FALSE COMPLAINT*.  I will now expose both this and other skullduggery and a very serious injustice that, to my knowledge, affects every one of you as it affected me.
>
> \*   \*   \*
>
> Since she started working for the WRL in May 2016, I had a romantic interest in [C.L].  It was obvious as a man and one who is very well read concerning these matters that she returned the sentiment.   The evidence was well known nonverbal signs such as body language that she was flirting with me.
>
> One piece of evidence that is important concerning what follows occurred sometime somewhat earlier in the summer of 2016.  I heard [C.L.] coughing loudly in the kitchen.   Somehow simultaneously another young male employee (probably an architect) whose name I can't recall * * * discovered this as he was walking past the kitchen.  I saw [C.L.] facing the wall at the sink in a red dress coughing in the kitchen with no lights on (light coming from the window) and when both of us were outside the doorway[,] she smiled and the other employee entered and started to inquire after her health while I decided not to enter.  It occurred to me that this may have been a fake cough (given the smile) designed to elicit male attention and sympathy.  It could have been directed primarily at me because my workstation (unlike the other male employee's) was not far from the kitchen and she was (fake) coughing loudly, so as to draw attention.
>
> Later on in the summer of 2016 for purposes which I assume were related to her work as an entry level interior designer, [C.L.] spent a great deal of time by herself in the sample room looking at interior finish samples.  It occurred to me that this circumstance was an opportunity for me to "make a move."
>
> \*   \*   \*
>
> Later on during the summer of 2016[,] there was a time when I was on my way into the office from the elevator lobby on the floor of our office

to my desk.  A group of employees which may or may not have included, [C.L.] (I do not know whether she was with them.), but who definitely included her father was heading into the elevator lobby through the glass doors to wait for an elevator.  On the other side of the hallway was the main entrance to the sample room.  I opened the door and held it for [C.L.] and she said that she was planning on going through the door but that instead she was going over somewhere else.  She followed through with her words by entering the sample room and going out of sight.  It seemed clear to me that her desire was that I should enter the sample room and initiate a romantic encounter.  I did not do so and I believe that I walked to my desk after leaving my lunch in an office refrigerator as was my routine and sat down to work.

*   *   *

As far as I remember, * * * there was a much more explicit incident that provides even stronger evidence.  By coincidence, [C.L.] and I entered the Hanna Office building through the same entrance at about the same time.  As we approached the security desk, [C.L.] asked the security man on duty * * * whether there was a private room in the building that could be used.  I did not hear the answer because I was continuing to walk to the elevator lobby.  It seems clear to me that [C.L.] wanted me to know exactly what she wanted at the same time as finding out how arrangements could be made, so that I would have no inhibitions to carry out certain intimate behavior.

I do not recall exactly when, but on at least one occasion after the first encounter in the sample room[,] I noticed that [C.L.] was behaving differently.  Since I had a good view of the hallway, I was able to note some things such as when people were passing by.  I noted that [C.L.] had come in in the morning with her long hair (more than shoulder length) down.  At some point during the day[,] she had put her hair up in a bun.  Furthermore, she walked one way down the hallway, so that I could see her through one door and then after she got to the second door[,] she abruptly turned around and again walked down the hallway past the first door to, I presume, the sample room.  It was obvious to me that her change of hair style and her movements were meant to entice me into joining her in the sample room for a romantic encounter. I did not try to do what she wanted.

*   *   *

Now, at some point in August 2016[,] I managed to have a talk with [C.L.] outside the office.  We walked and talked outside.  During our

conversation, she assured me that she wasn't looking to get involved with anyone and that she was content to be just friends. I did not think that she was telling the truth because of all my previous observations.

\*   \*   \*

Then, in February 2017, I decided to try to get serious. I emailed her asking that she would meet me at a semi-public location I won't reveal here. She politely, but definitely declined. I decide[d] to push the issue in a way that was not nice because she was obviously being difficult on purpose. Based on her behavior, her feelings had not changed and she clearly was looking to make me prove myself stronger than her.

I do not know exactly what occurred in the interim, but I was approached by our HR+ accountant person Diane Bartlett. She wanted me to come with her. After reaching an empty conference room[,] she, the head of the Cleveland office of the new DLR branch, Matt Janiak, and I had a disciplinary hearing. They mentioned that [P.L.] had informed them of the email exchange and that [C.L.] had related to them that I made her feel uncomfortable. They reprimanded me with [sic] and mentioned that I had threatened her which was actually criminal. Privately, I disagreed that I threatened (and still do) because technically no threats \* \* \* were issued, but I decided to maintain my silence. Matt indicated that I should consider any close relationship finished now because [C.L.] had indicated that she was not interested in the email exchange as part of her response. (I had not believed her truthfulness in the email.) Diane assured me that there would be a write up of the conversation that I would need to sign later on. \* \* \*

Given that no obvious sign of [C.L.]'s disinterest occurred (based on body language)[,] I decided to try another approach, in person this time. At the middle of March 2017, I went to [C.L.]'s desk, tapped her on the shoulder, and said that I wanted to talk. After moving to the model room, I said that the email conversation did not go well, but that I still wanted to talk with her and that we should go somewhere else. She said no and then said that she had been *told* by others that if I was to ask her something like this again that she was to report it. She then pleaded with me that it was a legal issue. As I was walking away, she called out to me in tone that I later identified to be playful, "Casual conversation only!"

\*   \*   \*

I determined on another course of action to see if I could resolve the whole issue. I figured that [C.L.]'s father [P.L.] would help me because I thought that he had to know of and want [C.L.] and me to "get together." Evidence for this (in addition to the incident concerning the elevator lobby described above) was that at some point [C.L.] and I had come into close physical proximity in the kitchen a[s] I was reaching for a new tea box to refill the tea packets set out and [C.L.] was at the sink for some reason. A few minutes afterward[,] I saw [P.L.] come through the same door he had previously and give me positive eye contact.

Having made up my mind, I composed a *PRIVATE* letter and had it delivered to him. In the letter I revealed with strong language a political opinion that I held, I asked for his help because it was obvious to me that [C.L.] still liked me. I detailed some of what had occurred between [C.L.] and me, I told him that [C.L.] would not get what she wanted in the manner that she wanted it but that it would be in a moral fashion. I show[ed] him how he could succeed in influencing her to do what I wanted (which was have a semi-private meeting in a certain location), and I ask[ed] that this communication be kept private. At no point did I threaten him or even was not nice (in a way similar to my email to [C.L.]), but I was assertive and straightforward.

The next day * * * at about 10:45 a.m., I was approached by Matt Janiak and asked to come with him. On the way to the elevator lobby[,] he mentioned the letter to [P.L.] (and the earlier incident) and that it was not to be tolerated. We met in the lobby with the head of engineering * * * and went down to the first floor elevator lobby. Diane Bartlett joined us from a different elevator. He said that it was my last day with the company and he asked about any of my possessions. I mentioned my copy of the 10th edition IES handbook and other things. He said that security had been given my photograph. Finally, he bid me to go. Although I later did receive the IES handbook in the mail, none of my other possession were returned to me.

I was still convinced that [C.L.] liked me (based on her actions the day I was fired), so I resolved to try to approach her on her way to work. I had discovered by accident that she took the 77F bus to work that I originally took when I started working at the company in 2014. Since I was temporarily staying again with relatives that I had been living with when I started working with the company, I figured that I could guess at the bus that she took. I was correct concerning all of these things. Throughout the bus trip, I had kept my eyes closed as I often do. As I prepared to exit the bus, I noticed that [C.L.] was present on the bus

and had let her hair come down in front of her face while she was using her phone.  She put her hair back revealing her face (an obvious sign of attraction) and proceeded to exit the bus from the front door while I exited the bus from the rear.  I was prepared to initiate a conversation when I noticed [P.L] coming to meet her.  He flashed me a big smile as he proceeded to escort her to the office building.

I took a few more bus trips on the same bus, on multiple days but I did not see her again.

Convinced based on my reading/research * * * that I might still be able to make something work out[,] I determined to try to contact [C.L.] through email.  I told her want [sic] I wanted and after she ignored me[,] I sent a series of nastygrams (which however did not contain threats).  I did not succeed in getting my way.  I thought about calling her on the phone, but I did not know her phone extension.  I obtained the phone information from an employee in another WRL office in reply to an email with the subject "Cleveland Phone Extensions."  I did not ever call her.

Time passed and I started my new job at The Osborne Engineering Company.  In a last ditch effort, I sent the following URL almost a full month after ceasing all communication with her: https://youtube.com/watch?v=X0MN-zg7r3M.  This is the hyperlink to a video entitled "A Toy Train in Space" if you don't trust the link. * * *

A week later I was informed by relatives at the house I temporarily was staying with after I lost my job, that a sheriff had come by the house with court papers for me.  I went to the county courthouse to pick them up and was given a temporary protection order (TPO) AKA restraining order.

During the hearing which I demanded all of the negative events concerning me and [C.L.] were brought up[,] including all email exchanges and my attempt to try to talk with her after I was fired.  Of particular relevance was the testimony *UNDER OATH* of P.L.  He claimed that the letter that I sent made him very scared and he claimed [C.L.] informed her supervisor about the negative email exchange for which I was reprimanded.  I believe that both were *LIES*.  This is a *CRIME* of *PERJURY*.  His big smile at me and thus his lack of fear in potentially confronting me in order to escort [C.L.] leads me to believe that he lied about his reaction to the letter. * * *

One additional important point concerning the hearing was that at the hearing[,] [C.L.] wore her hair in a way that I did not recall her doing before.  * * * I thought that it was a covert sign that the whole ordeal was not really serious (as she still liked me).

(Emphasis added.)  (Second amended complaint, exhibit No. 1.)

{¶ 6} The complaint further alleged that C.L. obtained a civil protection order against Weiler and that Weiler was subsequently convicted of the offense of violating a protection order.  (Second amended complaint, ¶ 16, 46.)

{¶ 7} C.L. filed a motion to dismiss the second amended complaint pursuant to Civ.R. 12(B)(6), arguing that it failed to state a claim on which relief could be granted.  The trial court granted the motion and dismissed the complaint with prejudice.  Weiler now appeals the trial court's judgment.

## II. Law and Analysis

### A.  Standard of Review

{¶ 8} C.L.'s motion to dismiss was filed under Civ.R. 12(B)(6).  A Civ.R. 12(B)(6) motion to dismiss for failure to state a claim on which relief can be granted "is procedural and tests the sufficiency of the complaint."  *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 605 N.E.2d 378 (1992), citing *Assn. for Defense of Washington Local School Dist. v. Kiger*, 42 Ohio St.3d 116, 117, 537 N.E.2d 1292 (1989).

{¶ 9} A trial court's review of a Civ.R. 12(B)(6) motion to dismiss is limited to the four corners of the complaint along with any documents properly attached to, or incorporated within, the complaint.  *Glazer v. Chase Home Fin. L.L.C.*, 8th Dist.

Cuyahoga Nos. 99875 and 99736, 2013-Ohio-5589, ¶ 38. An appellate court reviews de novo a trial court's decision granting a motion to dismiss under Civ.R. 12(B)(6). *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44, ¶ 5.

{¶ 10} In our review of a Civ.R. 12(B)(6) motion to dismiss, we must accept the material allegations of the complaint as true and make all reasonable inferences in favor of the plaintiff. *Jenkins v. Cleveland*, 8th Dist. Cuyahoga No. 104768, 2017-Ohio-1054, ¶ 8, citing *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 6. For a party to ultimately prevail on the motion, it must appear from the face of the complaint that the plaintiff can prove no set of facts that would justify a trial court granting relief. *Id.*, citing *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 245, 327 N.E.2d 753 (1975).

## B. Malicious Prosecution

{¶ 11} In the first and second assignments of error, Weiler argues the trial court erred in finding that he failed to state viable claims for malicious civil and criminal prosecution. To prevail on a malicious civil prosecution claim, the plaintiff must establish (1) malicious institution of prior proceedings against the plaintiff by the defendant, (2) lack of probable cause for institution of the prior proceedings, (3) termination of the prior proceedings in the plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings. *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 662 N.E.2d 9 (1996); *Fourtounis v. Verginis*, 8th Dist. Cuyahoga No. 102025, 2015-Ohio-2518, ¶ 22. The

elements of a malicious criminal prosecution claim are identical to those required for a malicious civil prosecution claim except that the element of arrest or seizure is not required. *Robb* at 269; *Trussell v. Gen. Motors Corp.*, 53 Ohio St.3d 42, 146, 559 N.E.2d 732 (1990).

{¶ 12} Weiler contends C.L.'s pursuit of a civil protection order against him and her subsequent complaint that led to the criminal prosecution of him for violating the civil protection order constituted malicious civil and criminal prosecutions of him. However, according to the face of the complaint, the civil protection order proceeding did not end in Weiler's favor; the civil protection order was entered against him. (Second amended complaint, ¶ 16.) Likewise, according to the complaint, the criminal proceedings against Weiler for violating the civil protection order did not end in his favor; he was convicted of violating the protection order. (Second amended complaint, ¶ 46.) Therefore, it is apparent from the face of the complaint that Weiler cannot prevail on either a malicious civil or criminal prosecution claim, and the trial court properly dismissed those claims.

{¶ 13} The first and second assignments of error are overruled.

## C. Constructive Fraud

{¶ 14} In the third assignment of error, Weiler argues the trial court erred in dismissing his constructive fraud claim.

{¶ 15} Constructive fraud is "'a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure

public interests.'" *Cohen v. Estate of Cohen*, 23 Ohio St.3d 90, 91-92, 491 N.E.2d 698 (1986), quoting *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 76-77, 285 S.E. 2d 679 (W.Va. 1981). Unlike actual fraud, "'[c]onstructive fraud does not require proof of fraudulent intent.'" *Id.*, quoting *Perlberg v. Perlberg*, 18 Ohio St.2d 55, 58, 247 N.E.2d 306 (1969). Rather, a constructive fraud claim "is dependent on a special confidential or fiduciary relationship, thereby giving rise to a duty to disclose." *Schmitz v. NCAA*, 2016-Ohio-8041, 67 N.E.3d 852, ¶ 63 (8th Dist.). In a fiduciary relationship, "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Federated Mgt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 66, 384, 738 N.E.2d 842 (10th Dist.2000).

{¶ 16} Weiler's second amended complaint does not allege any fiduciary relationship between himself and C.L. nor does the complaint contain any facts on which a reasonable inference could be drawn to establish a special, confidential, or fiduciary relationship. To the contrary, the second amended complaint alleges only Weiler's subjective impressions of C.L. and the fact that they were coworkers for a brief period of time. Despite Weiler's beliefs to the contrary, the allegations establish that they were merely acquaintances. In the absence of any allegation that Weiler was dependent on a special confidential or fiduciary relationship with C.L., he cannot establish a claim for constructive fraud, and the trial court properly dismissed the claim.

{¶ 17} The third assignment of error is overruled.

**{¶ 18}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EMANUELLA D. GROVES, J., CONCUR